**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| Northeast Ohio Coalition for the Homeless; Ohio Federation of Teachers; Ohio Alliance for Retired Americans; and Union Veterans Council, | Case No. 1:23-cv-26 |
| Plaintiffs, | |
| v. | |
| Frank LaRose, in his official capacity as Ohio Secretary of State, | |
| Defendant. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Northeast Ohio Coalition for the Homeless, Ohio Federation of Teachers, Ohio Alliance for Retired Americans, and Union Veterans Council file this complaint against Defendant Frank LaRose, in his official capacity as the Ohio Secretary of State, and allege as follows:

**NATURE OF THE CASE**

1.      This suit challenges certain provisions (the "Challenged Provisions") of Ohio Substitute House Bill 458 ("HB 458"), an omnibus election-administration law that imposes needless and discriminatory burdens on Ohioans' fundamental right to vote.

2.      The Challenged Provisions are a solution in search of a problem. No one seriously disputes that Ohio's elections are secure. Secretary LaRose has repeatedly celebrated the state's election system as the gold standard in America and made clear that fraud is exceedingly rare. He lauded the execution of the 2020 and 2022 elections as fair, accurate, and a model for other states to follow. Even Senator Theresa Gavarone, one of HB 458's staunchest supporters, concedes that Ohio performed well in its execution of the 2020 election. Nonetheless, members of the Legislature

have pressed on in their efforts to restructure the state's election system in ways that make it significantly harder for lawful voters—particularly young, elderly, and Black Ohioans, as well as military servicemembers and other Ohioans living abroad—to exercise their fundamental right to participate in the state's elections.

3.      HB 458 arises from the aftermath of the 2020 election, which featured record-breaking turnout and remarkably high participation among young voters and voters of color. The next year, Ohio legislators leveraged false allegations of widespread election fraud to justify proposing wide-ranging legislation meant to limit access to the ballot. After that initial effort stalled, they resurrected these policies in the last moments of the most recent legislative session by transforming a modest 15-page bill altering the schedule of special elections into a sweeping 147-page overhaul of nearly every aspect of Ohio's electoral system. They then rushed the bill through the Legislature with almost no time for public input, ultimately passing it literally in the dark of night.

4.      The Challenged Provisions will severely restrict Ohioans' access to the polls—particularly those voters who are young, elderly, and Black, as well as those serving in the military and others living abroad. Among other changes, they will:

- Impose one of the most stringent photo-identification requirements in the country by eliminating Ohioans' existing ability to provide bank statements, utility bills, government checks, paychecks, and other government documents as acceptable forms of identification when voting in person (the "**Photo-ID Requirement**");

- Significantly advance the deadline during which voters must provide the documents or information necessary to ensure that their provisional ballots or rejected mail ballots are counted, making it far more likely that lawful voters will have their ballots rejected and not counted in the state's elections (the "**Cure Restrictions**"); and

- Significantly advance the deadlines by which voters must submit applications for mailed absent-voter ballots and by which mailed absent-voter ballots must be received by the county board of elections, making it unjustifiably harder for lawful voters to successfully vote by mail, a necessity for many to exercise their fundamental right to vote (the "**Mail-Ballot Restrictions**").

5.      Individually, each of the Challenged Provisions make voting more difficult for broad swaths of eligible voters—particularly young, elderly, and Black voters, as well as members of the military and others living abroad. Together, they are an all-sides attack on the voting process, making it substantially harder to vote in person *and* by mail, while at the same time making it more difficult for voters to correct any mistakes made in the process. For many voters, the Challenged Provisions will prove too much to overcome, preventing them from participating in the electoral process entirely. But even those whom the Challenged Provisions do not completely disenfranchise now face a significantly more burdensome electoral process.

6.      There is no justification for the burdens that the Challenged Provisions impose on Ohioans. As Secretary LaRose and Governor DeWine have repeatedly made clear, election fraud is virtually nonexistent in Ohio. Yet, those who urged enactment of the restrictions claim they are necessary to save Ohio from election fraud and improve confidence in elections. To the extent there is any need to bolster public confidence in the security and accuracy of Ohio's elections, it is the result of HB 458's proponents' false and baseless claims of election fraud. That is not a valid justification for limiting voters' ability to exercise their fundamental right to vote. If the Challenged Provisions accomplish anything, it will be to diminish confidence in an electoral system that those in office have co-opted to entrench their positions of power at the expense of voters' rights.

7.      Because the Challenged Provisions impose unjustified and discriminatory burdens on the fundamental right to vote, they violate the First and Fourteenth Amendments to the U.S. Constitution.

## JURISDICTION AND VENUE

8.      Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the U.S. Constitution.

- 3 -

9.      This Court has original jurisdiction over this action because the matters in controversy arise under the U.S. Constitution. 28 U.S.C. § 1331. The Court also has original jurisdiction because this action seeks redress from the deprivation, under color of state law, of a right secured by a provision of the U.S. Constitution providing for equal rights of U.S. citizens. *Id.* § 1343.

10.     Venue is proper in the U.S. District Court for the Northern District of Ohio, Eastern District, because a substantial part of the events that give rise to Plaintiffs' claim occurred, and will occur, in this judicial district. 28 U.S.C. § 1391(b)(2).

11.     This Court has the authority to enter declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. It has the authority to enter injunctive relief pursuant to Federal Rule of Civil Procedure 65.

## PARTIES

12.     Plaintiff Northeast Ohio Coalition for the Homeless (the "Coalition") is a non-profit charitable organization operating in the City of Cleveland. Its mission is to eliminate the root causes of homelessness while supporting its diverse community through organizing, advocacy, education, and street outreach. It is a coalition of service providers, housing activists, and homeless people.

13.     The Challenged Provisions will frustrate the Coalition's mission and force the Coalition to divert its resources towards combatting the Challenged Provisions' harmful effects. For many years, the Coalition has worked to reduce barriers that deter or prevent homeless people from exercising their right to vote, including helping thousands of homeless people register to vote, working with county officials to ensure that homeless people have access to voting, collaborating with and founding a program to allow homeless voters to satisfy Ohio's voter-identification requirements by helping them to obtain state identification cards, providing funds to help homeless

- 4 -

people obtain birth certificates (which are necessary to obtain state identification cards), and assisting homeless voters to travel to their board of elections to vote. The Coalition devotes and has devoted significant staff and financial resources to these activities. The Challenged Provisions will force the Coalition to divert resources away from these activities and towards educating homeless voters on the law's new restrictions. Those voters will largely be located in Cleveland. The Coalition will need to ensure that the community it serves understands HB 458's new, onerous photo-identification requirements, and the shortening of time in which an absentee ballot may be received, counted, and cured after election day. If not for the Challenged Provisions, the Coalition would invest more of its resources into other activities, including those discussed above. Now, however, it will need to use those resources to combat the negative impacts of the Challenged Provisions, as described above.

14.     Plaintiff Ohio Federation of Teachers (the "Federation") is a union of professionals representing approximately 14,400 members in 55 local affiliates across Ohio, including over 5,000 members and 6 affiliates in Cuyahoga County. The Federation's members include public-school educators and support staff, higher-education faculty and support staff, and other public employees such as social workers. It is the state affiliate of the American Federation of Teachers. The Federation advocates for sound, commonsense public education policies, including high academic and conduct standards for students and greater professionalism for teachers and school staff, as well as excellence in public service through cooperative problem-solving and workplace innovations. The Federation asserts the claim in this Complaint on behalf of itself and its members.

15.     The Challenged Provisions will frustrate the Federation's mission by impeding its individual members' ability to vote (and in some cases entirely preventing them from voting), threatening the electoral prospects of the candidates it endorses, and making it more difficult for it

and its members to associate to effectively further their shared political goals. The Federation and its individual members devote significant resources to advocating for education policies that improve the daily lives and livelihood of the Federation's members, and correlatively, to ensure that those members are successfully able to access the franchise to support these policies at the ballot box. The Challenged Provisions will force the Federation to divert resources away from its activities and towards educating its voters on HB 458's new restrictions. Specifically, it will need to work closely with its local affiliates and coalition partners to ensure that its members understand HB 458's new, onerous photo-identification requirements, and the shortening of time in which an absentee ballot may be received, counted, and cured after election day. If not for the Challenged Provisions, the Federation would be investing more of its resources into other critical policy areas, such as school funding, redistricting, and restructuring Ohio's education department. Now, however, it will need to use those resources to combat the negative impacts of the Challenged Provisions, as described above.

16.     Plaintiff Ohio Alliance for Retired Americans (the "Alliance") is incorporated in Ohio as a 501(c)(4) nonprofit, social welfare organization. The Alliance is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to protect the civil rights of retirees and ensure that they obtain social and economic justice. The Alliance has chapters in various major cities throughout Ohio—including Cincinnati, Cleveland, Toledo, Dayton, Columbus, Akron, Canton, Warrant, Youngstown, and Athens—and smaller areas including Lima, Defiance, Massillon, Portsmouth, Bowling, Green, and Newark. The Alliance's membership— which consists of retirees from public and private sector unions, community organizations, and individual activists—consists of approximately 292,000 individuals. The Alliance asserts the claim in this Complaint on behalf of itself and its members.

17.     The Challenged Provisions will frustrate the Alliance's mission by impeding its individual members' ability to vote (and in some cases entirely prevent them from voting), threatening the electoral prospects of the candidates the Alliance endorses, and making it more difficult for the Alliance and its members to associate to effectively further their shared political goals. The Alliance and its individual members spend resources on voter registration, phone banking, tabling, and get-out-the-vote activities, as well as activities aimed at expanding the Alliance itself, such as recruiting new members, opening new chapters, and making presentations to members. The Challenged Provisions will force the Alliance to divert resources away from its activities and towards educating its members on HB 458's new parameters. In particular, many older voters in Ohio prefer to vote in person, and the Alliance will need to educate these voters about HB 458's restriction on valid forms of photo identification necessary to cast a ballot in-person, the means of obtaining these IDs, and the increased risk of needing to wait in long lines to vote due to the Challenged Provisions. Additionally, several of the Alliance's members are disabled or unable to leave their homes, and the Alliance will accordingly need to educate its members about the restrictions imposed by the Challenged Provisions on their ability to request an absentee ballot and cure any issues that arise from their ballots. If not for the Challenged Provisions, the Alliance would be investing more resources into other efforts such as voter registration and promoting its substantive policy campaigns in areas such as retirement income security, pension protections, supports and services for older Ohioans, social security, and Medicare/Medicaid. Instead, it will need to use those resources to combat the negative impacts of the Challenged Provisions, as described above.

18.     Plaintiff Union Veterans Council ("Union Veterans") is a 501(c)(5) labor organization and constituency organization of the AFL-CIO. Originally formed in 2009 to support

veterans and working families in achieving economic freedom and security, Union Veterans' membership includes veterans in unions around the country, including approximately 2,700 in Ohio. A significant part of Union Veterans' mission is furthering the political engagement of active-duty and retired service members in Ohio and beyond and assisting them in asserting and protecting their civil rights. To achieve its mission, Union Veterans engages, educates, and mobilizes active-duty and retired service members in holding elected officials accountable for their words and actions. Union Veterans asserts the claim in this Complaint on behalf of itself and its members.

19.     The Challenged Provisions frustrate Union Veterans' mission by impeding the ability of active service members and veterans to vote. For example, the Challenged Provisions make it harder for active service members and veterans living abroad to have their mail ballots arrive at their county boards of elections in time to be counted. Union Veterans has a strong organizational interest in protecting the voting rights of these current and former service members. The Challenged Provisions will force Union Veterans to divert resources away from its normal activities and towards educating those service members and veterans about the new restrictions, particularly the severely shortened period by which a mail ballot must reach the board of elections to be eligible for counting. If not for the Challenged Provisions, Union Veterans would be investing more of its resources into other critical policy areas, including protecting current and former service members' employment rights, health care access, and retirement benefits. Instead, it will need to use those resources to combat the negative impacts of the Challenged Provisions, as described above.

20.     Defendant Frank LaRose is the Secretary of State of Ohio and the state's chief election officer. Ohio Rev. Code § 3501.04. Secretary LaRose is responsible for overseeing the

State's entire elections process. Specifically, he is responsible for appointing the members of boards of elections in each of Ohio's 88 counties, issuing rules and instructions regarding the proper methods of conducting elections, prescribing the form of registration cards and ballots, compelling county election officers to observe the requirements of Ohio's election laws, investigating and reporting violations of the election laws, prescribing a general program for registering voters, prescribing a program of distribution of voter registration forms, and adopting rules for the purpose of implementing the program for registering voters. *See id.* § 3501.05.

## STATEMENT OF FACTS AND LAW

**I.      The Challenged Provisions were developed in the wake of two highly successful elections in Ohio featuring historic levels of voter participation.**

21.      In recent years, Ohioans have gone to the polls at impressive rates. 5,974,121 Ohioans—74% of registered voters—participated in the November 2020 election. That was the highest number of votes cast in an Ohio election by more than 200,000 votes, a remarkable feat given that the election occurred in the midst of a once-in-a-century global pandemic. Ohioans also participated in this year's general midterm election at a remarkable level, with 4,201,368 ballots cast, representing 52.3% of registered voters and Ohio's second highest-ever vote total for a midterm election.

22.      Data from these elections demonstrate that a substantial portion of the electorate relies on the ability to vote early in-person or submit their ballot by mail or drop box. In 2020, over 3.5 million voters did so, representing 58.6% of all voters. Of those, more than 2.1 million submitted their ballots by mail or by drop box, and the remaining 1.4 million participated in in-person early voting.

23.      In advance of the 2022 election, Secretary LaRose issued guidance that included instructions directing local voting officials to distribute to voters a document titled "Ohio Elections

are Secure." The fact sheet assures voters of the accuracy and security of Ohio's system, indicating that "[s]tatewide results show a 99.98% accuracy rate" in the 2020 election and that election boards "ensure no votes [a]re counted twice."

24.     Ohioans also increased their use of early in-person and mail voting in 2022 compared to the prior midterm election in 2018. On the eve of election day in 2022, 1.6 million Ohio voters had requested an early in-person or mail ballot, representing an increase of 3.9% over the previous record set in 2018.

25.     The main blemish in Ohio's administration of the 2020 and 2022 elections were persistent reports of long lines to cast a ballot in-person. Ohio's issues with polling-place lines stretch back decades. In 2004, Ohio's long voting lines—which forced voters to wait for as long as 12 hours—were responsible for disenfranchising an estimated 174,000 voters. Such lines were particularly bad in areas with large Black populations. A post-election survey found that Black voters reported an average wait time of 51.8 minutes, compared to white voters' 17.9 minutes. The 2008 and 2012 elections followed this trend. In 2008, for example, voters in Franklin County— home to a disproportionately large Black population—faced six-hour lines when they arrived to vote.

26.     In 2020, Ohio voters in many areas saw lines get worse as election day approached. By 11:00 a.m. on the Friday before election day, 275 people were waiting in line outside the Hamilton County early voting location. During the final days of early voting in Claremont County, voters faced lines as long as four hours. On the Saturday before election day, the line was already three-hours long at 7:00 a.m.

27.     Such problems persisted in 2022. Concentrated in the state's most populous areas, long lines began forming before polls opened on election day, snaking around polling places

multiple times. Voters faced wait times of over an hour, predominantly in dense, diverse parts of the state.

28.     Until HB 458's passage, a significant benefit of Ohio's robust mail-ballot regime was its potential to ease the burden on voters who would otherwise wait in hours-long lines to vote in person. Indeed, the Legislature amended the election laws in 2005 to permit no-fault absentee voting as a direct response to Ohio's excessive voting lines.

29.     Meanwhile, voter fraud has been virtually nonexistent in Ohio. In the words of Secretary LaRose, voter fraud in Ohio is "exceedingly rare." That conclusion aligns with nationwide research that has found a person is more likely to be struck by lightning than to impersonate another voter at the polls.

30.     The current consensus that voter fraud is not an issue in Ohio is nothing new. Repeated post-election audits in Ohio have found voter fraud rare. A post-election audit of the 2014 election found just 42 "irregularities" out of 3.1 million votes cast, amounting to an irregularity rate of .0000001 percent of votes. And even in the context of that infinitesimally small irregularity rate, the existence of an irregularity indicates at the very most a mere possibility of fraud. An audit of the 2016 election similarly found just 153 irregularities out of 5.6 million votes cast, an irregularity rate of .0000003 percent.

31.     On election night, 2020, Secretary LaRose called Ohio's election exemplary in its transparency, stating he would defend the system against any accusations of unfairness or manipulation if they surfaced in the wake of a result. He asserted that anyone who tried "to call into question the validity of Ohio's process just simply doesn't understand the process," and that he would "defend Ohio's [election] process and the voice of the people of Ohio because I know it's a good process."

32.     Since then, Secretary LaRose has been steadfast in his praise of the security, integrity, and accessibility of the state's elections. In February 2022, he declared that Ohio's elections are "proof positive you don't have to choose between secure or convenient elections -- we have both. In Ohio, easy to vote and hard to cheat aren't mutually exclusive."

33.     Following the November 2022 election, Secretary LaRose heralded a similar success, explaining that "[y]et again, the bipartisan teams of election professionals in all 88 counties delivered another inclusive and secure election for the people of Ohio. As county boards across the state [] continue to conduct their post-election audits of the results, I expect we'll once again soon see the same high accuracy rates in the results that Ohio voters have come to expect, and that help further instill voter confidence in both the process and the outcomes."

34.     Secretary LaRose reiterated his praise of Ohio's 2022 elections in his year-end review, highlighting how voters used the "secure absentee" process "in record numbers" and noting that post-election audits "once again validate[d] the incredible accuracy of Ohio's elections." Secretary LaRose further argued that the security of Ohio's elections gives "Ohioans the confidence they deserve that their elections reflect the true voice of the people."

35.     Consistent with these statements, Secretary LaRose often refers to Ohio as "the best in the nation" and setting the "gold standard" when it comes to election administration.

36.     Even Ohio legislators who have baselessly asserted that widespread voter fraud tainted the result of the 2020 presidential election have agreed that this was not the case in Ohio.

37.     Before the election, then-Senate candidate J.D. Vance, who has cast doubt on the general validity of the 2020 election results, said in a televised town hall that he trusts the integrity of Ohio's elections. Vance's opponent, Representative Tim Ryan, made sure to reaffirm the

integrity of Ohio's elections in his concession speech, calling his concession a "privilege" and a way to "respect the will of the people."

38.     State Representative Thomas Hall, a main proponent of HB 458, also introduced a 2021 resolution praising Ohio's elections. In that resolution's words, Ohio has become "a national model" for election administration by developing "a system that has ensured voters have confidence in the outcome of our elections," in which "[v]oter fraud and voter suppression are exceedingly rare."

## II.     Despite holding Ohio out as an exemplar of accurate elections, lawmakers used myths about fraud to develop the Challenged Provisions.

39.     Even as they lauded Ohio's elections as honest and accurate, lawmakers sought to capitalize on unfounded election-fraud claims to make it more difficult for Ohioans—particularly young, elderly, and Black voters, as well as those serving in the military and others living abroad—to participate in future elections.

40.     In the spring of 2021, lawmakers introduced House Bill 294, a sweeping voter suppression bill purporting to fix a problem with fraud that, as just discussed, they acknowledged did not exist.

41.     Secretary LaRose reacted to HB 294 by reminding stakeholders that "we shouldn't react to concerns of other states by modifying our state law when what other states should do is modify their states[' laws] to look like Ohio's."

42.     Reiterating that voter fraud in Ohio is "exceedingly rare," Secretary LaRose admonished politicians for "push[ing] the hyperbole button over and over again by claiming widespread fraud or widespread suppression" and lamented that rhetoric based on the false narrative of voter fraud "causes the average person to lose trust and faith in the [election] process."

43.     OAEO Executive Director Ockerman also reacted to HB 294 by agreeing with

Secretary LaRose that voter fraud is "extraordinarily rare" in Ohio and that Ohio's election systems are secure and well-structured.

44.     HB 294 eventually stalled in the Legislature as it moved on to different priorities. No further action was taken on the bill for more than a year and a half.

**III.     Lawmakers introduced and enacted HB 458 in the final days of the legislative session, leaving almost no time for public input.**

45.     Determined to enact these suppressive policies by the end of the legislative session, members of the Legislature rushed earlier this month to pass what ultimately became HB 458. They worked at a dizzying pace, leaving the public with few opportunities to comment on dramatic changes to Ohio's election code. And they did so in the face of vigorous objections from local election officials and Ohio voter-protection organizations who explained that these unnecessary changes would severely burden Ohio voters.

46.     First introduced in October 2021, HB 458 was a short, uncontroversial bill proposing to largely prohibit local entities from holding elections in August. The House passed this version of HB 458 in December 2021 and sent it to the Senate. The Senate Local Government and Elections Committee held a hearing on this version of HB 458 in March 2022 and two more in November 2022.

47.     Hours before a December 6 hearing on the bill, the Senate Committee transformed HB 458's original 15 pages into a 147-page omnibus voting law containing provisions very similar to those included in HB 294. After implementing a few additional amendments on December 13, 2022, the Senate Committee approved HB 458.

48.     Among its many troubling provisions, the Senate Committee's transformation of HB 458 added three notable restrictions on the right to vote in Ohio.

49.     First, the Photo-ID Requirement eliminates Ohioans' longstanding ability to use

bank statements, utility bills, government checks, paychecks, and other government documents as valid forms of identification at the polls and instead permitted only four forms of photo identification: a driver's license, state identification card, passport, and military identification.

50.     Second, the Cure Restrictions advance the deadline for voters to cure their provisional ballots and rejected mail ballots from seven days after election day to four days after election day.

51.     Third, the Mail-Ballot Restrictions advance the deadline to apply for a mail ballot from three days prior to election day to a week before election day, as well as the deadline for mail ballots to be delivered to the board of elections from ten days after election day to four days after election day.

52.     Just hours after its approval in the Senate Committee, HB 458 was presented and approved on the Senate floor.

53.     Two days later, in the dead of the night, the Ohio House passed HB 458 as amended by the Senate.

54.     Governor DeWine signed the bill into law on January 6, 2023.

55.     Despite the Ohio Constitution's requirement that "[e]very bill shall be considered by each house on three different days," Ohio Const. art. II, § 15(C), HB 458's substantive provisions did not receive a single hearing in a House Committee. While the House Ways and Means Committee earlier approved HB 458 when it purported only to eliminate August special elections, it never considered the Challenged Provisions broadly impacting Ohioans' voting rights.

56.     During the limited public debate that the Challenged Provisions received, the Legislature justified the Challenged Provisions as an effort to combat voter fraud. In a long speech explaining the bill's purpose, Senator Gavarone stated: "I want to state this as clearly as I can.

Even one person, one person voting illegally in our state is too many. I consider this just one first step, my personal journey to ensure that not even one illegal ballot is cast in this state."

57.     Senator Niraj Antani echoed that sentiment: "Securing the integrity of our elections must be our top priority. We must undertake every effort to prevent voter fraud, and requiring a photo ID to vote is a huge step in ensuring that."

58.     But as discussed above, state officials have repeatedly refuted any assertion that election fraud is actually a problem in Ohio. In addition to the Secretary's repeated statements that Ohio's election system is the "gold standard," Senator Gavarone—one of HB 458's staunchest supporters—conceded that Ohio performed well in audit of the 2020 election. And Governor DeWine himself has asserted that Ohio does such a "good job at conducting elections under both Republican and Democrat secretaries of state" that "the burden is on anybody who wants to make a change to describe why those changes need to be made."

59.     HB 458's proponents' fraud narrative is also belied by the speed with which they passed the law. If the Legislature was truly concerned about the integrity of Ohio's election system, they would have waited to see whether fraud occurred in the 2022 election. Yet, they rushed to pass HB 458 even though recounts and audits from Ohio's 2022 election were still ongoing. Indeed, by the time the Legislature passed HB 458, the Secretary had not even published his 2022 reports on provisional and absentee ballots, a process that the law significantly alters.

60.     The public's response to HB 458's sudden and sweeping changes to the electoral system was overwhelmingly negative. Emphasizing the undisputed strength of Ohio's election system, a coalition of Ohio voting rights organizations called on Governor DeWine to veto HB 458 and the "unjustified barriers to the ballot" it attempted to erect. The Coalition lamented the haste in which HB 458 was enacted, describing the "radical changes" required by the law as

- 16 -

"hastily added . . . during the tail-end of [a] lame duck session."

61.     The few parties capable of offering testimony to the Legislature about HB 458 agreed with this assessment. During the December 14 Senate Committee hearing, every single public comment opposed the bill. Indeed, it appears that in the period after the Senate Committee transformed HB 458 into the suppressive voting law that was enacted, just one member of the public offered written testimony in favor of its passage.

62.     The public outcry over HB 458 was captured by numerous legislators who decried the breakneck speed of the law's passage and the voter suppression it would cause.

63.     Senator Cecil Thomas highlighted that HB 458 "will create a situation where a lot more people won't be able to vote, especially our seniors." "[W]hat specific problems are we trying to solve," he asked. "Somebody needs to answer that question."

64.     Senator Paula Hicks-Hudson, a former Ohio election official, criticized HB 458 as "unnecessary" and "plain wrong." "The reason it is unnecessary," she explained, "is because we have heard on many occasions from the Secretary of State . . . that the past two elections . . . were free, they were fair, and they were secure."

65.     Representative Richard Brown described HB 458 as "being rushed through in [a] lame duck" session, "which should never happen when the subject of the bill is something as vitally important as voting." "This bill has not been thoroughly deliberated or vetted," he continued. "It has not had full and fair hearings . . . as many Ohioans who wanted to come to the State House to testify were not permitted to do so." Representative Brown soberly concluded that HB 458 will simply make "it more difficult to vote particularly for the elderly, the poor, the disabled, and communities of color."

66.     Representative Bride Rose Sweeney declared that "we should not be rewriting the

rules of our democracy at the 11th hour" of a lame duck session. She added: HB 458 "erodes" the integrity of the state's "electoral process and adds significant arbitrary barriers to Ohio's existing right to vote. It seeks to solve a non-existent problem."

67.     The tenor of the opposition to HB 458, too long to fully recount here, is well captured by Senator Hicks-Hudson. "I'm ashamed," she said, "I'm ashamed that we're standing here today talking about this."

## IV.     The Challenged Provisions

68.     HB 458 contains several provisions that, both independently and together, impose severe burdens on Ohioans' right to vote, particularly young, elderly, and Black voters, as well as those serving in the military or otherwise living abroad.

### A.     The Photo-ID Requirement

69.     Despite the absence of any reason to believe individuals have impersonated Ohio voters at the polls in recent elections, HB 458 imposes one of the most stringent photo-identification requirements in the country.

70.     For more than a decade, Ohioans appearing at a polling place to vote in-person have been able to prove their identity by offering any of the following: (1) a current and valid photo identification, (2) a military identification, (3) a copy of a current utility bill, (4) a copy of a bank statement, (5) a copy of a government check, or (6) a copy of any other "government document" except for a notice of voter registration mailed by a board of elections. Ohio Rev. Code § 3505.18(A)(1) (2006).

71.     There is little reason to believe that anyone has attempted to impersonate a voter at the polls using one of the identification forms listed above that does not include a photograph. Indeed, according to testimony offered by the ACLU Ohio, of the individuals Secretary LaRose has referred to the Ohio Attorney General between 2019 and October 2022 for investigation into

potential election fraud, not a single one was referred for in-person voter impersonation.

72.     OAEO Executive Director Ockerman, who has called HB 458's Photo-ID Requirement unnecessary, stated recently that "[w]hen it comes to the actual specific crime of one voter trying to walk into a voting location and impersonating another voter, that really is non-existent."

73.     Despite the absence of evidence that in-person voter impersonation is a problem in Ohio, HB 458's Photo-ID Requirement severely limits the ways in which voters may prove their identity at the polls.[1] It does so by amending two aspects of the Ohio Revised Code.

74.     First, it amends § 3505.18 such that the only form of identification acceptable for in-person voting is "photo identification."[2] Second, it amends subsection (AA) of § 3501.01 to define "photo identification" as an unexpired driver's license, state identification card (or interim state identification form), passport, or military identification card (including national guard or VA cards).

75.     A voter who appears at a polling place to vote but does not possess one of the few forms of acceptable photo identification under the Photo-ID Requirement will be forced to submit a provisional ballot. Ohio Rev. Code § 3505.181(A)(2) (as revised by HB 458). That provisional ballot may not be counted unless the voter returns to the board of elections and provides the required identification. *Id.* § 3505.181(B)(7)(b) (as revised by HB 458). As explained further below, HB 458 has made that process even harder by significantly advancing the deadline for

---

[1] The Photo-ID Requirement applies to all in-person voters, whether they vote at their polling place on election day or at the county board of elections' office during in-person early voting. *See* Ohio Rev. Code § 3509.051(B) (as revised by HB 458) ("An in-person absent voter shall provide photo identification . . . in the same manner as a voter who casts a ballot in person on the day of an election.").

[2] HB 458 provides a limited exception to the Photo-ID Requirement for voters who object to being photographed on religious grounds. *Id.* § 3505.19.

voters to provide that identification. *Id.*

76. By severely restricting the acceptable forms of identification at the polls and prohibiting the counting of provisional ballots unless the voter eventually provides the requisite identification, Ohio now imposes on its voters one of the strictest photo-identification requirements in the country.

77. HB 458's Photo-ID Requirement will have a dramatically negative impact on Ohioans who are simply trying to exercise their fundamental right to vote. A significant portion of Ohio's electorate does not possess any of its required forms of photo identification.

78. A 2011 analysis of Bureau of Motor Vehicles ("BMV") data by the Northeast Ohio Voter Advocates concluded that approximately 938,000 voting-age Ohioans lack a driver's license or state identification card.

79. The Photo-ID Requirement will impose particularly severe harms upon young, elderly, and Black Ohioans, who are far more likely not to possess an acceptable form of photo identification.

80. Recent estimates show that young voters are disproportionately unlikely to possess any of the acceptable forms of identification under the Photo-ID Requirement. A 2017 study suggests that, in Ohio, 38% of 18-year-olds, 28% of 19-year-olds, and 20% of those 20 to 24 do not have a driver's license. Furthermore, students attending college in Ohio are more likely to have out-of-state driver's licenses, which are not acceptable photo ID under HB 458.

81. While younger voters are less likely to possess a driver's license, they are *more* likely to possess a student identification card, many (if not all) of which contain a photo. Yet, HB 458's Photo-ID Requirement conspicuously excludes student identification cards as an acceptable form of identification at the polls. Meanwhile, it eliminates public-college students' existing ability

to use grade reports and other school documents containing their addresses as valid forms of identification at the polls. HB 458 thus ensures that younger voters are particularly unlikely to be able to vote at the polls in Ohio.

82. On the other end of the age spectrum, elderly voters are also particularly unlikely to possess the identification required to cast an in-person ballot under the Photo-ID Requirement. The 2017 study just discussed found that, in Ohio, 12% of those ages 75 to 79, 19% of those 80 to 84, and *31%* of those 85 and older lack a driver's license.

83. In addition to young and elderly voters, the Photo-ID Requirement will have a particularly devastating impact on Black Ohioans. Study after study finds that voters of color are less likely than white voters to own government-issued identification. When the Legislature proposed a similar photo-identification requirement in 2012, Policy Matters Ohio estimated that 260,000 Black adults in Ohio—about one in four—were likely to lack such identification. And a nationwide study found that about 25% of voting-age Black Americans lack government identification, compared to 8% of white Americans.

84. While HB 458 contains a provision allowing Ohioans to obtain a state identification card without charge, *see* Ohio Rev. Code § 4507.50(C) (as revised by HB 458), that provision does not alleviate the Photo-ID Requirement's unjustifiable burdens.

85. The law's "free" identification card is not cost or burden free. Ohioans without driver's licenses—the ostensible beneficiaries of this provision—cannot drive themselves to register for new identification. The closest state BMV office may be dozens of miles away and inaccessible by public transportation, posing a logistical and monetary obstacle.

86. Further, to obtain a state identification card, prospective voters must provide other forms of identification that may be inaccessible to someone without any form of photo

identification. *See id.* § 4507.51. For example, a voter seeking a state ID card must present the BMV with documentary proof of their legal presence in the United States by means of an original or certified copy of their birth certificate, a U.S. Passport (which, if the voter possessed, would make it unnecessary to obtain a state ID in the first place), or official immigration paperwork such as a naturalization certificate.

87.     The burden of obtaining a state identification card is multiplied for young, elderly, and Black Ohioans, who are less likely to have access to the type of transportation necessary to travel to a BMV office. Young and Black Ohioans, moreover, are less likely to have the work flexibility necessary to make that trip during normal business hours.

88.     For example, according to the U.S. Census Bureau's 2021 1-Year American Community Survey, Black Ohioans are nearly three times more likely to lack access to a vehicle than white Ohioans, nearly ten times more likely to rely on public transportation to get to work, and twice as likely to work in service occupations, which have particularly inflexible schedules.

**B.     The Cure Restrictions**

89.     The Photo-ID Requirement's dramatic limitations on the forms of identification allowed for in-person voting will require far more Ohioans to submit provisional ballots at the polls. When they do, they will discover that HB 458 has also made *that* process more difficult through its Cure Restrictions, nearly halving the period voters previously had to provide the documentation or information necessary to have their provisional ballots counted.

90.     Previously, an in-person voter forced to submit a provisional ballot due to their failure to provide proper identification had until a week after election day to return to the board of elections and provide the necessary proof of identity. HB 458's Cure Restrictions reduce that period to just four days after election day. Ohio Rev. Code § 3505.181(B)(7)(b) (as revised by HB

458).[3]

91.     Aside from lacking the right form of identification, an in-person voter may also be forced to cast a provisional ballot for other reasons, including if they are challenged by a poll worker. *Id.* § 3505.181(A)(5). Such voters can cure their provisional ballots by later returning to the board of elections and offering documentation resolving the basis of the challenge. *Id.* § 3505.181(B)(8) (as revised by HB 458). Because of the Cure Restrictions, however, these voters will have until just four days after election day to provide that documentation to the county board.

92.     The Cure Restrictions also will adversely impact those voters who attempt to vote by mail for the first time because they lack the requisite photo identification to vote in person.[4] If these voters make any technical mistakes in that process that cause their ballots to be rejected, they will have the opportunity to cure the defects. But the Cure Restrictions make *that* process more difficult as well.

93.     A mail ballot may be rejected for a variety of reasons, including if the statement accompanying the ballot is incomplete. Ohio Rev. Code §§ 3509.06(D)(3)(b), 3509.07(A). Such ballots may ultimately be counted, however, if the voter provides the board of elections with appropriate information or documentation to cure the deficiency. *Id.*

94.     When a new mail voter tries to fix the technical mistake, however, they will discover that HB 458 has similarly made that process far harder by also reducing the cure period

---

[3] In 2014, the Legislature reduced this period from ten days to seven. A challenge to that reduction was ultimately unsuccessful. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 635 (6th Cir. 2016). In enacting HB 458, the Legislature identified no valid justification for reducing the cure period even *further*.

[4] HB 458 does not eliminate the existing option for those voting by mail to provide the last four digits of their social security number in lieu of photo identification. *See* Ohio Rev. Code. Ann. § 3509.03(B)(5)(b) (as revised by HB 458) (allowing mail-ballot applicants to provide as proper identification their driver's license number, state identification card number, last four digits of their social security number, or a copy of their photo identification).

for mail ballots from seven days after election day to just four. *Id.* § 3509.06(D)(3)(b) (as revised by HB 458).

95. The Cure Restrictions' reduction of the cure period for rejected mail ballots creates a particularly pernicious trap for voters who make innocent, technical mistakes in completing the statement on the absentee-ballot envelope. For example, if the voter provides incomplete information in the identification envelope statement, then the election official mails a written notice to the voter informing them of the defect. *Id.* § 3509.06(D)(3)(b). But because the written notice must be sent by *mail*, the voter will not receive that notice for several days. By significantly shortening the cure period, the Cure Restrictions thus create a situation in which many voters will not find out that their mail ballots were rejected until after it is too late to cure.

96. These restrictions will impose particularly severe burdens on Ohio's young, elderly, and Black voters, who, as discussed above, disproportionately lack the resources, work flexibility, and/or mobility to ensure their ballots are cured within this shortened timeframe.

97. No legitimate state interest justifies these severe—and disparate—burdens on Ohio voters. As alleged above, Ohio's elections are safe and secure and routinely touted as such, even by Ohio election officials and legislators who *supported* the Challenged Provisions. Thus, the Cure Restrictions, like the other provisions of HB 458 challenged here, are harmful "solutions" to nonexistent problems that serve only to derogate Ohio citizens' right to vote.

## C. The Mail-Ballot Restrictions

98. As discussed above, in coming elections, many Ohioans who have long relied on the ability to provide the non-photo identification at the polls that the Photo-ID Requirement now prohibits will be forced, for the first time, to submit a ballot by mail. When they do, these voters will discover that, in addition to making it harder to vote in-person, HB 458 has simultaneously

made it harder to vote by mail through its Mail-Ballot Restrictions.

99.     The Mail-Ballot Restrictions accelerate two different deadlines governing the mail-ballot process: (1) the deadline to submit an application for a mail ballot, and (2) the date by which a mail ballot must reach the board of elections.

100.    As to the former, HB 458 more than *doubles* the number of days before election day by which voters must submit applications to receive a mail ballot. Specifically, it amends subsection (D) to Ohio Rev. Code § 3509.03, which previously allowed voters to submit mail-ballot applications by noon on the third day before election day, to require all mail-ballot applications to reach the board of elections one week before election day.

101.    The trap laid by the Mail-Ballot Restrictions' advancement of the application deadline will ensnare not only new mail voters, but also longtime mail voters, who for years have been able to submit a mail-ballot application as late as three days prior to election day.

102.    Voters whose mail-ballot applications are rejected as untimely under the Mail-Ballot Restriction's unnecessarily stringent deadline will likely be entirely disenfranchised, as they are unlikely to even learn that their applications were rejected until it is too late to vote in person.

103.    As for the voters fortunate enough to get to their polling place in the few days of voting that remain after their mail-ballot applications are rejected as untimely, they will encounter an in-person voting process that HB 458 has dramatically restricted through its Photo-ID Requirement. And if those voters need to vote before election day, many will be forced to travel long distances to the sole in-person early voting location in their county. Ohio Rev. Code. Ann. § 3509.051 (as revised by HB 458) (allowing early voting to occur only "at the office of the board of elections"); *id.* § 3501.10(C) (permitting boards of elections to maintain multiple office locations but prohibiting them from holding voting at more than one office location).

104.     Had this restriction been in place in past elections, a significant number of voters would have had their applications rejected at the last minute. While additional analyses are necessary to determine precisely how many mail-ballot applications in prior elections were submitted between three and six days prior to election day, the ACLU of Ohio estimates that, in 2020, Ohio counties received approximately 450,000 mail-ballot applications in the final week of the then-existing application period, more than half of which the Mail-Ballot Restrictions have now eliminated.

105.     To the extent that this restriction is motivated by a concern that the prior mail-ballot application deadline did not leave enough time for voters to return their completed ballots, that concern is unfounded. The analysis discussed above found that 90% of those 450,000 ballots obtained in the last week of the 2020 mail-ballot application period were successfully returned and counted. Indeed, in light of the Mail-Ballot Restrictions' second component—discussed immediately below—such a concern would be entirely of HB 458's own making.

106.     Whereas the Mail-Ballot Restrictions' first component makes it harder to obtain a mail ballot, the second component makes it harder to have that ballot counted. Prior to HB 458's enactment, valid mail ballots would be counted as timely so long as they were postmarked the day before election day and received by the board of elections ten days after election day. Ohio Rev. Code § 3509.05(B)(1) (2016).

107.     The Mail-Ballot Restrictions, however, advance the deadline for boards of elections to receive all mail ballots by nearly a *week*, prohibiting them from counting any mail ballot arriving more than four days after election day. *Id.* § 3509.05(D)(2)(a) (as revised by HB 458). That new deadline applies not only to ballots mailed domestically, but also ballots submitted by military service members and other Americans living overseas, *id.* § 3511.11(C)(2) (as revised by HB 458),

who may sign their ballot as late as the close of polls on election day, *id.* § 3511.09(A) (as revised by HB 458).

108.    This second component of the Mail-Ballot Restrictions will disenfranchise Ohioans for no good reason. Valid mail ballots that do not meet the Mail-Ballot Restrictions' accelerated return deadline will be rejected *solely* because of the speed of the mail, disenfranchising voters through no fault of their own. This result imposes particularly unjustifiable burdens on the voting rights of military and overseas voters, who have even less control over the speed with which their ballots are delivered.

## CLAIM FOR RELIEF

### Undue Burden on the Fundamental Right to Vote
### U.S. Const. amends. I, XIV; 42 U.S.C. § 1983
### (All Plaintiffs Against All Defendants)

109.    Plaintiffs reallege and incorporate by reference all prior paragraphs, as though fully set forth herein.

110.    A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

111.    "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden. The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." *Democratic Exec. Comm. of*

*Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019).

112.    In conceptualizing the burden that a state electoral regulation places on constitutional rights, courts are not limited to considering only the effort needed to comply with the regulation; they also may consider the law's broader ramifications, including the consequences of noncompliance. Federal courts have accordingly recognized that disenfranchising voters for defects in their absentee ballots imposes significant burdens on voting rights even if the effort needed for a voter to complete the ballot correctly appears slight when considered in isolation. *See, e.g., Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319 (stating burdens of absentee ballot signature matching requirement included increased risk of disenfranchisement from perceived signature mismatch); *Ne. Ohio Coal. For the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) ("Requiring boards of elections to reject the ballots of absentee and provisional voters who fail to accurately complete birthdate and address fields directly and measurably disenfranchises some voters.").

113.    Both independently and cumulatively, the Challenged Provisions inflict severe burdens on Ohio voters. They also, individually and cumulatively, impose disproportionately severe burdens on young, elderly, and Black voters in the state, as well as military servicemembers and other Ohioans living abroad.

114.    The Photo-ID Requirement, one of the strictest in the country, imposes severe burdens on Ohioans who have long been able to use non-photo identification to vote in person and prohibits boards of elections from counting those voters' provisional ballots unless these voters return with the required photo identification within four days of election day.

115.    These burdens will be particularly severe for young, elderly, and Black voters. Recent studies show that those voters are disproportionately less likely to possess an acceptable

form of photo identification under HB 458 and also less likely to be able to travel to a BMV office to obtain such identification. They are thus at increased risk of being disenfranchised.

116. The Cure Restrictions impose severe burdens on Ohio voters by halving the window voters previously had to provide the documentation or information necessary for their provisional ballots or rejected mail ballots to be counted. Again, these restrictions will fall most heavily on Ohio's young, elderly, and Black voters, as well as members of the military and others living overseas, who disproportionally lack the ability to cure their ballots within this shortened time frame.

117. The Mail-Ballot Restrictions impose severe burdens on Ohio voters by more than doubling the number of days before election day by which voters must request a mail ballot and advancing the deadline by which boards of elections must receive mail ballots by nearly a week. Together, these restrictions make it both harder to request a mail ballot and to have that ballot counted. The Mail-Ballot Restrictions sharply increase the likelihood of disenfranchisement: voters who miss the mail-ballot application deadline are unlikely to learn their applications were rejected with enough time to vote in person. And for voters who submit their applications a week before Election Day, the Mail-Ballot Restrictions may *still* prevent their ballots from being counted simply because the mail may be too slow to deliver the ballots to the boards of elections, something entirely outside voters' control. This is particularly the case for Ohioans serving in the military or who otherwise live abroad.

118. There are no legitimate, let alone compelling, government interests that justify the burdens that these provisions create, whether considering these provisions individually or cumulatively.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a.  Declaring that the Challenged Provisions in HB 458, individually and collectively, violate the First and Fourteenth Amendments to the U.S. Constitution;

b.  Enjoining Defendant, his agents, officers, employees, and successors, and all persons acting in concert with him, from enforcing any of the Challenged Provisions of HB 458;

c.  Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d.  Granting any such other and further relief as this Court deems just and proper.

Dated: January 6, 2023

Respectfully submitted,

Abha Khanna*
ELIAS LAW GROUP LLP
1700 Seventh Ave., Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.com

Daniel C. Osher*
Joseph N. Posimato*
Joel J. Ramirez*
Ian U. Baize*
ELIAS LAW GROUP LLP
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4518
dosher@elias.law
jposimato@elias.law
jramirez@elias.law
ibaize@elias.law

 _/s/ Donald J. McTigue_____
Donald J. McTigue (0022849)
   Trial Counsel
John Corey Colombo (0072398)
Katelyn I. Street (0102134)
McTIGUE & COLOMBO LLC
545 East Town Street
Columbus, OH  43215
Telephone: (614) 263-7000
dmctigue@electionlawgroup.com

*Motion to appear *pro hac vice* forthcoming

*Attorneys for Plaintiffs*