**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | |
|---|---|
| **NORTHEAST OHIO COALITION FOR THE HOMELESS; OHIO FEDERATION OF TEACHERS; OHIO ALLIANCE FOR RETIRED AMERICANS; UNION VETERANS COUNCIL; AND CIVIC INFLUENCERS, INC.,** )))))))) | **CASE NO.  1:23 CV 00026** |
| **Plaintiffs,** )) | |
| **v.** )) | |
| **FRANK LAROSE, In his Official Capacity as Ohio Secretary of State,** ))) | **JUDGE DONALD C. NUGENT** |
| **Defendant,** ))) | **MEMORANDUM OF OPINION AND ORDER** |
| *and* )) | |
| **OHIO REPUBLICAN PARTY, SANDRA FEIX, AND MICHELE LAMBO,** ))) | |
| **Intervenor-Defendants.** )) | |


## I.  INTRODUCTION AND FACTUAL BACKGROUND

This matter is now before the Court on *Ohio Secretary of State's Motion for Summary Judgment* (ECF #48) and *Intervenor-Defendants' Motion for Summary Judgment* (ECF #46), in connection with a challenge by Plaintiffs to certain provisions of Ohio Substitute House Bill 458

("HB 458"), an omnibus election-administration law passed by the Ohio legislature in late December 2022, and signed into law by Ohio Governor Mike DeWine on January 6, 2023.[1] (ECF #13, *Amended Complaint for Declaratory and Injunctive Relief*, ¶¶ 1, 49-60, 134-145). HB 458 made various changes to the contours and timing of both in-person and absentee voting under Ohio law. Among the changes brought about by HB 458 are the following provisions:

(1) **Photo-ID:** The kinds of acceptable photo-ID needed for voter registration and in-person voting was changed such that (a) a "hard copy" of one's Ohio Driver's License or Ohio ID card with current address is no longer needed to register to vote, with identification of an Ohio Driver's License *number* or Ohio ID *number* now being sufficient, and the ability to register by using a military ID, copy of a photo-ID, or non-photo-IDs such as a utility bill, bank statement, government check, paycheck, or other government document with current address was eliminated;[2] (b) the ability to use a U.S. Passport or Passport Card was added to the list of

---

[1] Shortly before signing HB 458, Governor DeWine signed HB 45, which contains provisions superseding HB 458's revisions to two sections of the election code. *See* Sub. H.B. 45, 134th Gen. Assemb. (Ohio 2022) § 735.10 ("The amendments made by this act to sections 3505.183 and 3509.05 of the Revised Code supersede any conflicting provisions of those sections, as amended by H.B. 458 of the 134th General Assembly"). With one exception relating to restrictions on ballot drop-boxes, the differences between HB 458 and HB 45's superseding provisions are not material to Plaintiffs's claims. (*See* ECF #13, *Amended Complaint*, PageID #67-68 n.1). For the purposes of this *Memorandum of Opinion and Order* (as well as in the references made in the *Amended Complaint*), the revisions made to Ohio's election laws are referred to collectively as "HB 458." But, as reflected in Plaintiffs' prayer for relief in the *Amended Complaint*, Plaintiffs' challenges to HB 458's revisions to Sections 3505.183 and 3509.05 of the Ohio Revised Code are actually made in connection with the superseding changes to HB 458 made by HB 45.

[2] OHIO REV. CODE §§ 3501.01(AA), 3503.14 & 3503.20. (*See also* ECF #46-2, Office of the Ohio Secretary of State, Directive 2023-03, PageID #412-413). While Directive 2023-03 states that a photo-ID or a copy of that photo-ID "may no longer be used to register to vote," it follows that the practical effect of only requiring an Ohio Driver's License *number* or Ohio ID *number* to register is that the actual card or image of that card is no longer needed.

acceptable photo-IDs for in-person voting (whether early or on Election Day), and – similar to the requirements for registration – the use of non-photo-IDs such as a utility bill, bank statement, government check, paycheck, or other government document with current address was eliminated (but the use of military IDs for in-person voting remained as it was prior to HB 458);[3] (c) for in-person absentee voting at the board of elections, again, the use of a U.S. Passport or Passport Card was added, and the use of non-photo-IDs such as a utility bill, bank statement, government check, paycheck, or other government document with current address, along with the use of only an Ohio Driver's License number or Ohio ID number, was eliminated (but the use of military IDs remained as it was prior to HB 458);[4] (d) as to absentee voting by mail (or return by drop-box), the use of a U.S. Passport or Passport Card was added to the list of acceptable photo-IDs (actually, just a copy of these photo-IDs is needed, as one is not required to submit their *actual* Ohio Drivers License or *actual* Ohio ID card with their mail-in ballot),[5] and the use of non-photo-IDs such as a utility bill, bank statement, government check, paycheck, or other government document with current address was eliminated (but the use of military IDs, as well as one's Ohio Driver's License *number* or Ohio ID *number*, remained as it was prior to HB

---

[3]       OHIO REV. CODE §§ 3501.01(AA).  (*See also* ECF #46-2, Directive 2023-03, PageID #413-414).

[4]       OHIO REV. CODE §§ 3501.01(AA).  (*See also* ECF #46-2, Directive 2023-03, PageID #414).

[5]       Confined or disabled voters, such as those in nursing homes, have the option of showing their actual photo-IDs to the bipartisan team of election officials who come to their location to facilitate voting.  OHIO REV. CODE §§ 3501.01(AA)(2), 3509.03, 3509.04 to 3509.08, 3511.02, 3511.05 & 3511.09.  (*See also* ECF #46-2, Directive 2023-03, PageID #414).

458);[6] and (e) with respect to voters who arrived for in-person voting, either early at the board of elections or at their polling place on Election Day without any ID, the photo-ID requirements for appearing at the board of elections after Election Day, during the "cure period," were made the same as are applicable for Election Day voting and in-person early voting, including eliminating the use of non-photo-IDs such as a utility bill, bank statement, government check, paycheck, or other government document with current address.[7]  A provision allowing voters who have a religious objection to producing a photo-ID, who are then given an affidavit of religious objection when they arrive to vote, was added.[8]

A chart, describing these changes in table form, is included in Part III-C-2-a of this *Memorandum of Opinion and Order*.

(2) **Early Mail-Ballot Deadlines:**  The close of the time by which one must apply for a mail-in ballot was changed from three days before Election Day to "close of business on the seventh day before election day" (as before passage of HB 458, a voter may still apply for an absentee ballot after the regular application deadline, no later than 3:00 pm on Election Day, if

---

[6]

OHIO REV. CODE §§ 3501.01(AA).  (*See also* ECF #46-2, Directive 2023-03, PageID #414).

[7]

OHIO REV. CODE §§ 3505.18, 3505.181, 3505.182 & 3505.183.  (*See also* ECF #46-2, Directive 2023-03, PageID #414).

[8]

An affidavit of religious objection is not permitted if the Ohio Bureau of Motor Vehicles ("BMV") has issued a currently unexpired photo-ID or if the last four digits of the voter's Social Security Number provided on the affidavit do not match those digits found in the Statewide Voter Registration Database.  OHIO REV. CODE §§ 3505.181, 3505.182, 3505.183 & 3505.19. (*See also* ECF #46-2, Directive 2023-03, PageID #414).

-4-

they or a minor child has been unexpectedly hospitalized),[9] and the time allowed by the board of elections for mail-in ballots to arrive at the board of elections after Election Day was changed from ten days to four days.[10]

(3) **Elimination of In-Person Monday-Before-Election-Day Voting:**  The ability to vote in-person at the board of elections on the Monday-Before-Election-Day was eliminated and the six hours of early in-person voting formerly allowed on that day is reallocated to the Monday through Friday of the week before Election Day, with essentially all of those hours allocated as additional evening voting ability.[11]

(4) **Drop-Box Provisions:**  The amount of "Secure Receptacles (Drop Boxes)" for the purpose of accepting absentee ballots was set at one, to be located outside the board of elections offices.[12]

(5) **Cure Period After Election Day:**  The time period by which a provisional ballot

---

[9]

OHIO REV. CODE §§ 3503.16(E), 3509.03(D), 3509.031(A)(2), 3509.08, 3511.02 & 3511.04. (*See also* ECF #46-2, Directive 2023-03, PageID #415).

[10]

OHIO REV. CODE §§ 3505.18, 3505.181, 3505.182 & 3505.183.  This is now the same amount of time allowed for absentee mail-in voters to "cure" their mail-in ballots by providing additional or corrected information, as well as the amount of time allowed for provisional ballot voters to "cure" their ballots by providing the required photo-ID.  (*See also* ECF #46-2, Directive 2023-03, PageID #416).  Thus, the amount of time for any "activity" to occur at the board of elections is now standardized at four days.

[11]

Section 4(A) of HB 458.  (*See also* ECF #46-2, Directive 2023-03, PageID #418).

[12]

(*See* ECF #46-2, Directive 2023-03, PageID #417) (for boards of elections that maintain more than one office in a County, the board may designate any of its offices for the return of absentee ballots, but it may designate only one of those offices for doing so).  Although HB 458 stated that such drop-box was to be open to receive ballots only during the board of elections' operating hours, HB 45 amended that provision to provide that it be open at all hours during the voting period.  *Id*. at n.20.

voter may cure a ballot by going to the board of elections and providing a photo-ID, for those signing and producing a religious objection affidavit, and for absentee voters to provide corrected or other additional information was standardized with the absentee ballot receipt deadline at four days after Election Day, changing from an earlier seven days.[13]

On January 6, 2023, Plaintiffs Northeast Ohio Coalition for the Homeless, Ohio Federation of Teachers, Ohio Alliance for Retired Americans, and Union Veterans Council filed a *Complaint* challenging these five provisions of HB 458, and seeking declaratory and injunctive relief.  (ECF #1).  Plaintiffs allege that these provisions constitute an "Undue Burden on the Fundamental Right to Vote" under the First and Fourteenth Amendments to the United States Constitution and Section 1983 to Title 42 of the United States Code.  On January 27, 2023, an *Amended Complaint* was filed, adding Civic Influencers, Inc., as a Plaintiff.  (ECF #13).[14]

On March 21, 2023, Intervenor-Defendants Ohio Republican Party, Sandra Feix, and

---

[13]

OHIO REV. CODE §§ 3505.18, 3505.181, 3505.182 & 3505.183.  (*See also* ECF #46-2, Directive 2023-03, PageID #415).

[14]

For the sake of clarity, when identifying an individual Plaintiff, the Court will refer to each Plaintiff by its full name, or a shortened form that retains indication of its identity (except where a quoted passage employs a single-letter acronym, such as "NEOCH").  In cases involving numerous institutional parties, such as this one, the overuse of single-letter acronyms bears the risk of producing a mesmerizing "letter stew" of interchanging references to "NEOCH," "OFT," "OARA," and "UVC" (and even perhaps "CII"), with the further effect of removing all reference to the institutional party's purpose or identity.  Because an often-cited case in this area of the law (including within this *Memorandum of Opinion and Order*) is *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016), the short form "*NEOCH*" is used for references to that case, along with legal citation.  "*NEOCH*" may also occasionally be used in the context of identifying certain discovery documents identified by Northeast Ohio Coalition for the Homeless in connection with the summary judgment motion briefing.

Michele Lambo moved to intervene as party defendants. (ECF #20, *Motion to Intervene*).[15] The *Motion to Intervene* was granted on April 18, 2023 (ECF #26).

On October 6, 2023, Defendant Ohio Secretary of State Frank LaRose and the Intervenor-Defendants filed motions for summary judgment. (ECF #48, *Ohio Secretary of State's Motion for Summary Judgment* & ECF #46, *Intervenor-Defendants' Motion for Summary Judgment*). Plaintiffs filed a consolidated opposition to both motions on October 20, 2023. (ECF #62, *Plaintiffs' Response in Opposition to Defendant's and Intervenor-Defendants' Motions for Summary Judgment*). Reply briefs were filed by Defendant and the Intervenor-Defendants on November 3, 2023. (ECF #69, *Ohio Secretary of State's Reply in Support of His Motion for Summary Judgment* & ECF #70, *Reply Memorandum in Support of Intervenor-Defendants' Motion for Summary Judgment*). The *Motions for Summary Judgment* are now ready to rule by the Court.[16]

---

[15]

Intervenor-Defendants Sandra Feix and Michele Lambo are election workers who have served as precinct election officials in past Ohio elections, who intend to do so in the future, and who have regularly voted in past primary and general elections and intend to do so in the future. (ECF #20-1, *Memorandum in Support of Motion to Intervene*, PageID #145).

[16]

In addition to the motions for summary judgment, the Court also received two *amicus* briefs, *Brief of Amicus Curiae The Foundation for Government Accountability in Support of Defendant's Motion for Summary Judgment* (ECF #49-1), and *Honest Elections Project Proposed Amicus Brief in Support of Defendant Frank LaRose's Motion for Summary Judgment* (ECF #57-1). The Court granted the motions to appear *pro hac vice* filed by the attorneys for each of these *amici* who needed to so file, (*see* ECF #49, #50, #51, #52 [in connection with the proposed *amicus* brief filed by The Foundation for Government Accountability] & ECF #55, #56, #57, #58, #59 [in connection with the proposed *amicus* brief filed by Honest Elections Project]). The Court reviewed and considered each of the proposed *amicus* briefs filed in connection with the case. No opposition to their filing was offered. Thus, for purposes of the record, the *Motion of the Foundation for Government Accountability for Leave to Participate as Amicus Curiae and File Brief* (ECF #49) is GRANTED, and the *Motion of Honest Elections Project for Leave to File Amicus Brief in Support of Defendant's Motion for Summary Judgment* (ECF #57) is GRANTED, as will be reflected in the *Order* issued along with this *Memorandum*

For each of the reasons stated herein, the Court finds that the challenged provisions of HB 458 are constitutional under the First and Fourteenth Amendments, and thus that Defendant Ohio Secretary of State and the Intervenor-Defendants are entitled to judgment as a matter of law. Accordingly, *Ohio Secretary of State's Motion for Summary Judgment* (ECF #48) and *Intervenor-Defendants' Motion for Summary Judgment* (ECF #46) are each GRANTED.[17]

## II. <u>PLAINTIFFS' CHALLENGE TO CERTAIN PROVISIONS OF HB 458</u>

Plaintiffs assert in the *Amended Complaint* that "[t]he Challenged Provisions will severely restrict Ohioans' access to the polls – particularly those voters who are young, elderly, and Black, as well as those serving in the military and others living abroad." Specifically, they allege that they will:

_____

*of Opinion and Order.*

[17]

During the briefing on the motions for summary judgment, Defendant Frank LaRose and the Intervenor-Defendants filed a joint *Intervenor-Defendants' and the Secretary's Motion to Strike Plaintiffs' Improper, Untimely, and Late-Filed Evidence* (ECF #68), in connection with the Court's granting (ECF #65) of *Plaintiffs' Motion for Leave to Supplement Summary Judgment Appendix* (ECF #64), in which the Plaintiffs moved to include evidence gathered by the Plaintiffs related to Ohio's August 2023 Special Election, which election occurred after the formal close of fact discovery on July 31, 2023, and which evidence was first submitted to the Court on October 27, 2023, after the close of expert discovery on September 8, 2023. The matter was thereafter vigorously briefed by the parties, including arguments related to the timing of the offer of the information, the gathering of the information, the disclosure of the information, and whether the method of offering some of the information by an attorney affidavit summarizing the contents of the information violated the "witness-advocate rule" necessitating the disqualification of one of the Plaintiff law firms. (*See* ECF #64, #68, #72, #73). In the end, the Court does not find that the supplementary information offered by Plaintiffs has the effect of changing the Court's finding that summary judgment is appropriate on the issue of the constitutionality of the challenged provisions of HB 458, or that a ruling on these issues now, to perhaps effectively reverse the Court's earlier decision to grant Plaintiffs' motion to submit the evidence (ECF #65), is necessary to the resolution of this case. Accordingly, *Intervenor-Defendants' and the Secretary's Motion to Strike Plaintiffs' Improper, Untimely, and Late-Filed Evidence* (ECF #68) is DENIED as moot.

-8-

- Impose one of the most stringent photo-identification requirements in the country by eliminating Ohioans' existing ability to provide bank statements, utility bills, government checks, paychecks, and other government documents as acceptable forms of identification when voting in person (the "**Photo-ID Requirement**");

- Significantly advance the deadline during which voters must provide the documents or information necessary to ensure that their provisional ballots or rejected mail ballots are counted, making it far more likely that lawful voters will have their ballots rejected and not counted in the state's elections (the "**Cure Restrictions**");

- Significantly advance the deadlines by which voters must submit applications for mailed absent-voter ballots and by which mailed absent-voter ballots must be received by the county board of elections, making it unjustifiably harder for lawful voters to successfully vote by mail, a necessity for many to exercise their fundamental right to vote (the "**Mail-Ballot Restrictions**");

- Severely restrict counties' ability to provide secure drop boxes where voters can personally deliver their absent-voter ballots (the "**Drop-Box Restriction**"); and

- Eliminate early voting the day before election day (the "**Monday-Voting Prohibition**").

(ECF #13, *Amended Complaint*, ¶ 4) (emphasis in original).

Defendant Ohio Secretary of State filed an *Answer* to the *Amended Complaint* on March 7, 2023. (ECF #18). The Intervenor-Defendants included a *Proposed Answer* to the *Amended Complaint* along with their *Motion to Intervene*, (ECF #20-3), which *Proposed Answer* was effectively filed with the Court's granting of the *Motion to Intervene* on April 18, 2023. (ECF #26).

### III. LEGAL ANALYSIS

#### A. Summary Judgment

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue"

rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those
> portions of "the pleadings, depositions, answers to interrogatories, and admissions
> on file, together with affidavits, if any," which it believes demonstrates the
> absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is

"material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Miller v. City of Shaker Heights*, 438 F. Supp. 829, 835

(N.D. Ohio 2020).  Determination of whether a factual issue is "genuine" requires consideration

of the applicable evidentiary standards.  A dispute is "genuine" when there is enough evidence,

under applicable evidentiary standards, for a reasonable jury to find for either party.  *Miller*, 438

F. Supp. at 835  The court will view the summary judgment motion in the light most favorable to

the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-

movant.  The non-moving party may not simply rely on its pleadings, but must "produce

evidence that results in a conflict of material fact to be solved by a jury."  *Cox v. Kentucky Dep't*

*of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).  If the defendant "successfully demonstrates, after a

reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the

bare allegations of the complaint to support an essential element of his or her case . . . ," the

court should grant summary judgment.  *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir.

2004).

Summary judgment is appropriate in election law challenge cases when it is clear that a

-10-

plaintiff has failed to meet the evidentiary burden of demonstrating that a challenged election law places an unconstitutional burden on voters.  *See*, *e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 187-89 (2008) (granting summary judgment in a case challenging Indiana's photo-ID voting requirements); *Mays v. LaRose*, 951 F.3d 775, 794 (6th Cir. 2020) (reversing district court finding that Ohio law relating to absentee voting application deadline as applied to jail-confined voters was unconstitutional, and holding that Ohio Secretary of State was entitled to summary judgment).

Here, the Plaintiffs bear the burden of proof that the challenged provisions of HB 458 are unconstitutional.  *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 548 (6th Cir. 2014).

**B.  Challenges to State Election Laws as Undue Burden (*Anderson-Burdick*)**

As stated by the Sixth Circuit, in *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016) (hereinafter referred to in short form as "*NEOCH"*), "[E]very election law places at least some burden on individual voters."  *Id.* at 630.  Because of this certainty, courts are often called upon to "weigh that hindrance against [a challenged law's] regulatory justification."  *Id.* (insert supplied).  "On one hand, 'voting is of the most fundamental significance under our constitutional structure.'"  *Id.* (citing *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).  "On the other, '[c]ommon sense, as well as constitutional law compels the conclusion that government must play an active role in structuring elections.'"  *Id.* (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)).

Accordingly, under what has become known as the "*Anderson-Burdick*" test, named after the Supreme Court decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court has articulated a "flexible standard" to apply

-11-

when considering challenges to a State's election law:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789, and *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 213-14 (1986)).

The Sixth Circuit applies the *Anderson-Burdick* framework to decide undue burden challenges to State election laws. *See*, *e.g.*, *NEOCH*, 837 F.3d at 630-31.

In *NEOCH*, the Sixth Circuit described how this evaluation works in practice:

> [T]he level of scrutiny into a challenged election law varies based on the severity of its constraint on voting rights. "[S]evere restriction[s] must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). At the other end of the spectrum, "minimally burdensome and nondiscriminatory" regulations inevitably result in "a less-searching examination." *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016). For regulations that "fall[] somewhere in between the two extremes, 'the burden on the plaintiffs is weighed against the state's asserted interest and chosen means of pursuing it.'" *Id.* (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)) (alteration omitted) As a general matter, "important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788.

*NEOCH*, 837 F.3d at 631 (inserts in original, parallel citation omitted).

Thus, under the *Anderson-Burdick* framework, courts first determine the burden on the right to vote imposed by a challenged law. *Mays v. LaRose*, 951 F.3d 775, 784 (6th Cir. 2020). Then, based on the extent of the burden, courts determine the level of scrutiny the law receives and whether the law survives that scrutiny. *Id.*

As described in *Mays*, the Sixth Circuit applies three different levels of scrutiny depending on the challenged law's level of burden on the right to vote:

-12-

- If a law is a "reasonable nondiscriminatory restriction[]," rational basis review applies, and the law passes muster if it advances the State's "important regulatory interests." *Mays*, 951 F.3d at 784 (internal quotation marks omitted).

- If a law imposes "severe restrictions" on the right to vote, "such as poll taxes or limiting *access* to the ballot," strict scrutiny applies. *Id.* (emphasis supplied).

- If the law imposes a "moderate" burden such as when the State "facially discriminates between two classes of electors," courts in the Sixth Circuit "depart[] from the traditional tiers of scrutiny" and apply *Anderson-Burdick*'s "flexible standard." *Id.* at 784, 786.

*Mays*, 951 F.3d at 784-786.[18]

The flexible standard of *Anderson-Burdick* requires courts to weigh the law's burdens on the right to vote against "the precise interests put forward by the state as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Mays*, 951 F.3d at 784 (internal quotation marks omitted). A plaintiff mounting a facial *Anderson-Burdick* challenge to a State election statute "bear[s] a heavy burden of persuasion." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (internal quotation marks omitted).

To determine a law's burden, the Sixth Circuit considers "the burden that the provisions place on all Ohio voters." *NEOCH*, 837 F.3d at 631. This is so because "[z]eroing in on the

---

[18]  In *Mays*, the "facial discrimination" between two classes of electors, examined in the context of the applicable deadlines for requesting an absentee ballot, contrasted "any elector [registered voter], including non-felon jail-confined voters" (who were required to make such request to the board of elections by noon three days before Election Day) and "electors who themselves, or whose minor children, are hospitalized because of an unforeseeable accident or medical emergency that occurs after the deadline has passed" (who could make such request until 3:00 pm on Election Day). In *Mays*, the court found no constitutional violation in the distinction drawn by the statute under either the First or Fourteenth Amendments.

-13-

abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst." *Id.*; *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199-200 (2008) (lead opinion of Stevens, J.); *id.* at 207 (Scalia, J., concurring in the judgment).[19]

Applying these standards, the Court now turns to Plaintiffs' claims.

## C. Plaintiffs' Challenge to HB 458

The ultimate question to be resolved is whether the challenged provisions of HB 458 are constitutional. But first, the Court must address the question of whether Plaintiffs have standing to challenge the pertinent provisions of HB 458.

### 1. *Standing*

"That a litigant must establish standing is a fundamental element in determining federal jurisdiction over a 'case' or 'controversy' as set forth in Article III of the Constitution." *Morrison v. Bd. of Education*, 521 F.3d 602, 608 (6th Cir. 2008). "To establish standing, a plaintiff must show an injury in fact that is fairly traceable to the defendant's conduct and is likely to be redressed by a favorable judicial decision." *Memphis A. Philip Randolph Inst.*, 978

---

[19]

The Sixth Circuit has noted that, in some cases, courts must evaluate a law's burdens from the perspective of the affected voters. *See Mays*, 951 F.3d at 784-85. But that requirement applies only in cases where courts are evaluating a non-uniform rule under a statute that effects "disparate treatment" on various classes of voters. *Id.* The cases of *Northeast Ohio Coalition for the Homeless* and *Mays* are not inconsistent. *Mays* requires evaluation of a law's impact on certain subgroups of affected voters when a law directly distinguishes between those subgroups and accords them different voting rights. *Northeast Ohio Coalition for the Homeless*, on the other hand, bars courts from considering the effects on such subgroups as applied under a *uniform* law, absent direct or circumstantial evidence of a racial or other discriminatory intent. *NEOCH*, 837 F.3d at 631 (specifically noting the decisive concurring opinion in *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment) ("[W]hat petitioners view as the law's several light and heavy burdens are no more than the different impacts of the single burden that the law uniformly imposes on all voters"); *id.* at 636 (noting an exception where "[f]acially neutral laws can be motivated by invidious racial discrimination"). Here there is no claim of invidious discrimination of any kind, racial or otherwise.

-14-

F.3d 378, 386 (6th Cir. 2020). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To be entitled to declaratory or injunctive relief, a plaintiff "must show actual present harm or a significant possibility of future harm." *Memphis A. Philip Randolph Inst.*, 978 F.3d at 386.

An organization may have standing either in its own right, *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016), or on behalf of its members "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Memphis A. Philip Randolph Inst.*, 978 F.3d at 386 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).

Defendant Ohio Secretary of State asserts that Plaintiffs do not have standing to bring this case because, first, "they have not established a diversion of resources," (ECF #48, *Ohio Secretary of State's Motion for Summary Judgment*, PageID #2769), and second, that, even if they have shown a diversion of resources, "they have failed to show any diversion of resources that *impairs their missions*," (ECF #48, PageID #2773) (emphasis supplied). Intervenor-Defendants do not raise a standing challenge.

Bearing in mind that "[on] summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)) (insert and omission in original), and that, in this "one count" case (founded on 42 U.S.C. § 1983, to assert a collective claim of unconstitutionality under the First and Fourteenth Amendments), "[w]hen one party has standing

-15-

to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable," *NEOCH,* 837 F.3d at 624 (citing *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999)), the Court will first look to the standing arguments presented by Northeast Ohio Coalition for the Homeless contained in the Plaintiffs' consolidated opposition brief to the two motions for summary judgment, (ECF #62, *Plaintiffs' Response in Opposition to Defendant's and Intervenor-Defendants' Motions for Summary Judgment*, PageID #3737-3748).

In the *Amended Complaint*, Northeast Ohio Coalition for the Homeless described its grounds for asserting standing as follows:

> The Challenged Provisions will frustrate the Coalition's mission and force the Coalition to divert its resources towards combatting the Challenged Provisions' harmful effects. For many years, the Coalition has worked to reduce barriers that deter or prevent homeless people from exercising their right to vote, including helping thousands of homeless people register to vote, working with county officials to ensure that homeless people have access to voting, collaborating with and founding a program to allow homeless voters to satisfy Ohio's voter-identification requirements by helping them to obtain state identification cards, providing funds to help homeless people obtain birth certificates (which are necessary to obtain state identification cards), and assisting homeless voters to travel to their board of elections to vote. The Coalition devotes and has devoted significant staff and financial resources to these activities. *The Challenged Provisions will force the Coalition to divert resources away from these activities and towards educating homeless voters on the law's new restrictions*. Those voters will largely be located in Cleveland. *The Coalition will need to ensure that the community it serves understands HB 458's new . . . photo-identification requirements, and the shortening of time in which an absentee ballot may be received, counted, and cured after election day. If not for the Challenged Provisions, the Coalition would invest more of its resources into other activities, including those discussed above. Now, however, it will need to use those resources to combat the negative impacts of the Challenged Provisions*[.]

(ECF #13, *Amended Complaint*, ¶ 13) (emphasis, omission, and insert supplied).

In its opposition to the motion for summary judgment filed by Defendant Ohio Secretary of State (ECF #48), Plaintiff Northeast Ohio Coalition for the Homeless produced a considerable amount of credible and admissible evidence in support of its standing claims. (*See* ECF #63,

-16-

Exh. 5, *Declaration of Molly Martin* [Community Organizer for Northeast Ohio Coalition for the Homeless], ¶ 3, PageID #3999) (stating that Northeast Ohio Coalition for the Homeless' mission is to "eliminate the root causes of homelessness" and "[h]elping homeless people exercise their right to vote is one of [its] top priorities").[20] (*See also* ECF #63, Exh. 6, *NEOCH Resp. to Interrog. No. 3,* PageID #4006-4007) (providing extensive description of numerous new efforts needed to be taken in response to the changes brought about by HB 458, including added efforts to assist homeless voters in the more arduous process of obtaining a photo-ID driver's license or State ID instead of the easier-to-obtain "official correspondence" such as a utility bill, bank statement, government check, or paycheck formerly acceptable as in-person voting identification, and new educational efforts, as well as the diversion of resources needed to perform those efforts). (*See also* ECF #63, Exh. 7, *Dep. of Molly Martin*, PageID #4029) (describing basic mission); *id.* at PageID #4044 (describing creation of new staff positions to address the changes brought about by HB 458).

In support of standing, Northeast Ohio Coalition for the Homeless also identifies "spend[ing] more time . . . coordinating mail delivery to homeless clients as a result of the

---

[20]

Throughout this *Memorandum of Opinion and Order*, the Court makes efforts to provide the pertinent Electronic Case Filing Reference Number ("ECF #") attached to the pleading or other document being referenced. In connection with the motions for summary judgment, Defendant's and Intervenor-Defendants' exhibits are individually identifiable by an "ECF" sub-number, such as "ECF #46-2" used to describe the individual exhibit of Ohio Secretary of State Directive 2023-03, filed along with the Intervenor-Defendant's motion, numbered as "ECF #46." The exhibits filed by Plaintiff are all contained in a single 2148-page document filed under the ECF number "ECF #63." While this did not raise any problem in allowing the Court to view the individual exhibits (as that singly-numbered document had electronic cross-referencing capability within it), this *Memorandum of Opinion and Order* accordingly identifies ***all*** of Plaintiffs' summary judgment Exhibits as "ECF #63," along with, where needed, the pertinent "PageID #" identifying the individual page or pages referenced.

increased need to obtain necessary documentation to satisfy the state ID application process."
(ECF #63, Exh. 5, *Martin Decl.*, ¶ 4, PageID #3999; Exh. 6, *NEOCH Resp. to Interrog. 3,*
PageID #4006-4007; Exh. 8, *NEOCH E-mail & Attachments,* PageID #4088-4092 (e-mail from
NEOCH staff member with information on obtaining ID's for homeless voters)).  It also states
that it must "revamp its previous voter organization efforts," which previously focused on
providing homeless voters transportation to the polls on the Monday before election day.  (ECF
#63, Exh. 6, *NEOCH Resp. to Interrog. 3,* PageID #4006-4007; Exh. 7, *Dep. of Molly Martin*,
PageID #4034)), and now, with Monday-Before-Election-Day in-person voting eliminated, it
"has spent staff time identifying additional volunteers who can provide transportation on days
other than the Monday before Election Day."  (ECF #63, Exh. 5, *Martin Decl.*, ¶ 5, PageID
#3999-4000; Exh. 6, *NEOCH Resp. to Interrog. 3,* PageID #4006-4007)).  Further, it asserts that
"because HB 458 makes it more difficult for its community to vote," it has created new
informational materials in 2023 and "devoted more staff time and trainings" on HB 458 to ensure
that it will be able to accurately assist voters.  (ECF #63, Exh. 5, *Martin Decl.*, ¶ 6, PageID
#4000; Exh. 6, *NEOCH Resp. to Interrog. 3,* PageID #4006-4007; Exh. 9, *Martin Timesheet*,
PageID #4094-4096 (timesheet of NEOCH staff member showing hours worked on HB 458-
related tasks in April and May 2023)).

     Northeast Ohio Coalition for the Homeless concludes by stating, "But for HB 458,
NEOCH would spend more of its resources helping homeless people register to vote and travel to
their board of elections to cast their ballots."  (ECF #63, Exh. 5, *Martin Decl.*, ¶ 7, PageID
#4000).

     In the earlier case of *Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612
(6th Cir. 2016), a case essentially identical to this one on the standing issue, the same lead

Plaintiff as here sought injunctive relief against the same Defendant as here,[21] challenging the

*then-newly-enacted* provisions of Ohio's election laws, as contained in Senate Bills 205 and

216.[22]  In that case, as here, Northeast Ohio Coalition for the Homeless asserted essentially

identical facts in support of standing (actually, it offers more in the present case).  On appeal, the

Sixth Circuit found that standing clearly existed with Northeast Ohio Coalition for the Homeless

(the argument challenging its standing was raised for the first time on appeal):

> Ohio points to our decision in *Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th
> Cir. 2014), and argues that NEOCH and CCH have suffered no injury.  In that
> case, we held that an organization that had conducted voter outreach lacked
> standing to challenge absentee-ballot procedures permitting hospitalized voters to
> obtain absentee ballots later than jailed voters.  *Id.* at 459.  The bases offered to
> support its injury claim – instructing election volunteers who were already being
> trained in current absentee-voting procedures and speculation that the law

---

[21]

In *NEOCH*, the original defendant was then-Ohio Secretary of State Jon Husted.  Within days, the State of Ohio intervened as a defendant, and the Columbus Coalition for the Homeless ("CCH") was added as a plaintiff.  *NEOCH*, 837 F.2d at 620 n.5.  Throughout the opinion, the court refers to defendants Ohio Secretary of State and State of Ohio collectively as "Ohio."

[22]

The changes to Ohio election law made by Senate Bills 205 and 216 were:  (1) county boards of election were required to reject the ballots of absentee voters and provisional voters if the identification envelopes or affirmation forms submitted by them, respectively, contained an address or birthdate that did not perfectly match voting records; (2) reduced the number of post-election days for absentee voters to cure identification-envelope errors, and provisional voters to present valid identification, from ten to seven; and (3) limited the ways in which poll workers could assist in-person voters.  *NEOCH*, 837 F.3d at 618.  While the district court found that all three provisions imposed an "undue burden" on the right to vote and disparately impacted minority voters, the Sixth Circuit reversed that finding with respect to the "undue burden" claims related to the technical accuracy of address and birthdate information on provisional voter forms, the reduction of "cure period" days, and the limits on poll worker assistance of in-person voters.  *Id.*  The Sixth Circuit also reversed the "disparate impact" findings as to all three claims.  *Id.*  Only the district court's "undue burden" finding related to requiring boards of elections to reject absentee ballots for what sometimes amounted to typographical errors on the return envelope (such as "transposing the location of the month and year numerals of a birthdate, writing the current date by mistake, and inverting digits in an address") was upheld.  *Id.*

-19-

compelled the group to divert resources – were insufficient.  *Id.* at 459-60.

> Unlike the plaintiff organization in *Fair Elections* that challenged **then-existing** voting law, NEOCH takes issue with **newly-enacted** provisions.  That distinction is not just academic.  Whereas the *Fair Elections* plaintiff merely exhausted "efforts and expense [in] advis[ing] others how to comport with existing law, NEOCH has immediate plans to mobilize its limited resources to revise its voter-education and get-out-the-vote programs on account of SB 205 and SB 216.  In the past, NEOCH focused on educating and assisting the homeless with mail-in voting.  Given the changes ushered in by SB 205 and SB 216, NEOCH determined that its resources are better spent assisting the homeless in participating in early in-person voting.  To that end, it plans to redirect its focus for the 2016 general election by encouraging early in-person voting and driving homeless voters to the polls.  It reports that this will require more volunteers, time, and expenditures.  That is not simply the "effort and expense" associated with advising voters how to "comport" with the law, *ibid.*, but an overhaul of the get-out-the-vote strategy of an organization that uses its limited resources helping homeless voters cast ballots.  Their injury is imminent, as well as concrete and particularized.

*NEOCH*, 837 F.3d at 624 (emphasis supplied, inserts in original).[23]

Similar to its position in the earlier *NEOCH* case, the Ohio Secretary of State founds its standing arguments here on *Fair Elections Ohio v. Husted.* (See ECF #48, *Ohio Secretary of State's Motion for Summary Judgment*, PageID #2769; ECF #69, *Ohio Secretary of State's Reply*, PageID #5999-6002).  Similar to the Sixth Circuit's decision in the earlier *NEOCH* case – given that the case now before the Court also clearly involves a challenge to newly-enacted provisions of Ohio's election laws – this Court also rejects the Secretary's position.

Northeast Ohio Coalition for the Homeless has standing to bring this case.  And, because

---

[23]

In *Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014), the Sixth Circuit described the Ohio election law at issue as "the years-old late-jailed-electors issue."  *Id.* at 459.  Here, as in *NEOCH*, Plaintiffs challenge newly-enacted changes to the Ohio election law.  In fact, as stated earlier, Plaintiffs filed their initial *Complaint* (ECF #1) on the same day that Ohio Governor Mike Dewine signed HB 458.  (ECF #62, PageID #3735).

all of the Plaintiffs bring the same single claim, the condition of standing is satisfied generally.[24]

## 2. *The Challenged Provisions and the Burdens Imposed*

The Plaintiffs' challenges to the provisions of HB 458 will be addressed in the order that they arise in the voting calendar, specifically: (1) the photo-ID requirements (which apply throughout the voting period); (2) the mail-ballot schedule and deadlines (which first arise at the time one may apply for a mail-in ballot);[25] (3) the time period made available for early in-person voting (including redistributing the former "Monday-Before-Election-Day" hours to the same number of hours throughout the rest of the early in-person voting period); (4) ballot "drop-box" availability (relating to where early mail-in voters may return their ballots); and (5) the "cure period" (the number of days after Election Day available for those who either voted a provisional ballot during the in-person early-voting period or on Election Day to appear at the board of elections with the required photo-ID, or to persons who had mail-in ballots returned). The Court then will address Plaintiffs' argument that the cumulative changes to Ohio's election laws by HB

---

[24]

While, as here, the Sixth Circuit decision in *NEOCH* ended its standing analysis and discussion after finding that Plaintiff Northeast Ohio Coalition for the Homeless had standing to bring First and Fourteenth Amendment claims (as well as a claim under the Voting Rights Act) sufficient to confer standing on behalf of both itself and Intervenor-Defendant Columbus Coalition for the Homeless, *see NEOCH*, 837 F.3d at 624 ("Because NEOCH has organizational standing, we do not reach Ohio's other arguments regarding NEOCH's and CCH's standing to bring suit"), the Court notes here that, in this case, each of the Plaintiffs came forward with sufficient and credible evidence of their own individual basis for standing similar to that produced by Plaintiff Northeast Ohio Coalition for the Homeless. (*See* ECF #62, PageID #3740-3742 [Ohio Alliance for Retired Americans], PageID #3742-3743 [Union Veterans Council], PageID #3743-3745 [Ohio Federation of Teachers], PageID #3745-3747 [Civic Influencers])).

[25]

Under Ohio law, this period is over ten months, with respect to November general elections. *See* OHIO REV. CODE § 3509.03(D) (permitting voters to apply to receive absentee voter ballots beginning "the first day of January of the year of the elections for which the absent voter's ballots are requested"); *see also Mays*, 951 F.3d at 792 ("Ohio law provides electors over ten months to request an absentee ballot").

458 impose undue burdens on Ohio voters.  (ECF #13, *Amended Complaint*, ¶ 138).

Under the *Anderson-Burdick* framework, the Court must first examine the burden that is imposed on Ohio voters by the challenged provisions of HB 458.  The Court begins this analysis by first noting that Plaintiffs have not identified *any* registered voter who has been, or will be, *prevented* from voting under the challenged provisions of HB 458,[26] given that even if a voter does not have one of the photo-IDs now required to vote in-person under HB 458, one does not need a photo-ID to register to vote or to vote absentee by mail-in ballot.

### a.  *Changes to ID Requirements for In-Person Voting*

Plaintiffs' first, and primary, challenge to HB 458 relates to HB 458's institution of a changed list of acceptable identification needed to cast a vote in certain instances.  (ECF #13, *Amended Complaint*, ¶ 139).  Prior to HB 458, in addition to various kinds of photo-IDs, voters could register to vote or vote with non-photo-ID documents, such as a utility bill, bank statement, government check, paycheck, or other document showing a voter's current address.  OHIO REV. CODE § 3505.18(A)(1) (2022).  HB 458 removed the ability to use the non-photo-ID option for in-person voting events, such as voting on Election Day, voting early in-person at the board of elections, or, for those producing no ID at the time of voting, "curing" the provisional ballot given to them when voting by visiting the board of elections for a number of days after Election

---

[26]

The Supreme Court noted in *Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008), that the relevant group of voters in challenges to a State's photo-ID requirements is *registered* voters.  *Crawford*, 553 U.S. at 200 (granting summary judgment based on the reasonableness of the State in having a photo-ID requirement, and noting plaintiff's failure to "provide us with the number of registered voters without photo identification").  Challenges to mail-in ballot application deadlines, mail-in ballot receipt deadlines, early in-person voting hours, ballot drop-box number and location, and a ballot "cure period" can ***only*** be evaluated with respect to registered voters.

-22-

Day.  OHIO REV. CODE § 3501.01(AA)(1).  The ability to register to vote or vote absentee by

mail-in ballot without a photo-ID (and instead using an Ohio Driver's License number or Ohio

ID number) prior to HB 458 was retained.  (ECF #46-2, Directive 2023-03, PageID #413-414).

HB 458 also added U.S. Passports and Passport Cards to the list of acceptable photo-IDs.  OHIO

REV. CODE § 3501.01(AA)(1).  With the passage of HB 458, a military ID could no longer be

used to register to vote (though, unchanged from prior to HB 458, it can be used for everything

else, such as Election Day voting, in-person absentee voting, absentee voting by mail, and curing

a provisional ballot).  OHIO REV. CODE §§ 3501.01(AA) & 3503.14.  HB  458 also added a

provision making State photo-IDs free to obtain.  OHIO REV. CODE §§ 4507.233(A),

4507.50(A)(1)(a) (effective April 7, 2023).  HB 458 further allows individuals with a religious

objection to being photographed an option to vote in person without a photo-ID.  OHIO REV.

CODE § 3505.19 (effective April 7, 2023).

These changes are presented visually in the following chart, drawn from information

contained in a directive sent by the Ohio Secretary of State to the Board Members, Directors, and

Deputy Directors at each of the Ohio county boards of election.  (ECF #46-2, Office of the Ohio

Secretary of State, Directive 2023-03):

*(Line Spacing Intentionally Added to Allow for Chart to Appear on Single Page)*

**Voter Identification Requirement Chart**
(W/D = Withdrawn from Prior Statutes)

| Forms of Voter ID Allowed | Register to Vote | | Election Day Voting | | In-Person Absentee Voting | | Absentee Voting by Mail | | Provisional Voting | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Prior | HB 458 | Prior | HB 458 | Prior | HB 458 | Prior | HB 458 | Prior | HB 458 |
| Ohio DL/ID With Current Address (*)  (HB 458 Adds Ability to Use BMV Interim DL) | Yes | Actual DL/ID No Longer Needed  (DL/ID Number Serves) | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Ohio DL/ID With Former Address (*)  (HB 458 Adds Ability to Use BMV Interim ID) | Yes | Actual DL/ID No Longer Needed  (DL/ID Number Serves) | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Military ID | Yes | No  (W/D) | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| U.S. Passport or Passport Card | No | No | No | Yes  (Adds to Prior) | No | Yes  (Adds to Prior) | No | Yes  (Adds to Prior) | No | Yes  (Adds to Prior) |
| Utility Bill, Bank Statement, Government Check, Paycheck, or Other Government Document With Current Address | Yes | No  (W/D) | Yes | No  (W/D) | Yes | No  (W/D) | Yes | No  (W/D) | Yes | No  (W/D) |
| Ohio DL/ID *Number* | Yes | Yes | No | No | Yes | No  (W/D) | Yes | Yes | Yes | No  (W/D) |
| Last Four Digits of SSN | Yes | Yes | No | No | Yes | No  (W/D) | Yes | Yes | Yes | No  (W/D) |

\* HB 458 also added an exemption to the photo-ID requirement for those with religious objections.
(*See* ECF #46-2, Directive 2023-03, PageID #415).

-24-

With all of the options universally available to all Ohio voters to register to vote or vote with an array of photo-IDs, or to register to vote or vote *without* a photo-ID, after passage of HB 458, it is difficult to imagine how the photo-ID voter identification provisions of HB 458 impose anything more that a minimal "burden" on any Ohio voter.

In fact, the Supreme Court has already held as much in the course of upholding an Indiana photo-ID law essentially the same as Ohio's is now after passage of HB 458.  *See Crawford*, 553 U.S. at 197-200, 204 (lead opinion of Stevens, J.); *id.* at 209 (Scalia, J., concurring in the judgment).  "A photo identification requirement imposes some burdens on voters that other methods of identification do not share," but those burdens "are neither so serious nor so frequent as to raise any question about the constitutionality of" a photo-ID requirement.  *Id.* at 197 *(*opinion of Stevens, J.); *id.* at 209 (opinion of Scalia, J.).  Even for voters who may not yet possess an acceptable form of photo-ID, "the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even present a significant increase over the usual burdens of voting."  *Id*. at 198 (opinion of Stevens, J.).  Even if a photo-ID requirement might place  "a somewhat heavier burden . . . on a limited number of persons," including "elderly persons" and "homeless persons," any such burden is fully "mitigated" by the fact that all voters can still cast a no-excuse absentee ballot without a photo-ID, using only the last four digits of their Social Security Numbers.  *Id.* at 199 (in *Crawford*, the "mitigation" was the even more burdensome process involved in casting a provisional ballot); *see also* OHIO REV. CODE § 3509.03(B)(5)(b) (effective April 7, 2023).  Thus, "even [if] the burden may not be justified as to a few voters, that conclusion is by no means sufficient to establish [a] right to . . . relief" via a facial challenge to a photo-ID requirement such as the one presented here.  *Crawford*, 553 U.S. at

-25-

199-200 (opinion of Stevens, J.) (footnote describing the "mitigating" provisional voting process omitted).

Today, at least 18 States, including Ohio, generally require photo-ID for in-person voting.[27] The record here confirms that, like the photo-ID statute at issue in *Crawford*, Ohio's photo-ID requirement imposes no more than a minimal burden, if any, for the vast majority of Ohio voters. Obviously, this requirement poses no burden whatsoever on those who already possess a qualifying photo-ID, which, based on record items offered by Plaintiffs, may in fact be every registered voter in Ohio. Using data produced by Plaintiffs' Expert Rocío Titiunik, Ph.D., it was shown that the number of voting age Ohio citizens who possessed an unexpired Ohio Driver's License or Ohio ID card as of July 14, 2023 (8,664,522) exceeds by more than 700,000 persons the number of Ohio registered voters as of the same date (7,929,151). (ECF #46-26, *Report of Janet R. Thornton, Ph.D.* [Defendants' Expert], PageID #1043-1044) (number of persons in Ohio possessing Ohio Driver's Licenses or Ohio IDs exceeds number of registered voters). The Court also notes that these numbers may not even account for Ohio registered voters who possess another form of acceptable photo-ID, such as a U.S. Passport or Passport Card, or military ID. *See* OHIO REV. CODE § 3501.01(AA)(1). Given what appears to be a real possibility that *all* Ohio registered voters may in fact already possess a qualifying photo-ID, it is

---

[27]

    *See also* ALA. CODE § 17-9-30 (*Alabama*); ARK. CODE ANN. § 7-1-101(40) (*Arkansas*); FLA. STAT. § 101.043 (*Florida*); GA. CODE ANN. § 21-2-417 (*Georgia*); IDAHO CODE § 34-1006(2) (*Idaho*); IND. CODE § 3-5-2-40 (*Indiana*); KAN. STAT. ANN. § 25-2908(h) (*Kansas*); LA. STAT. ANN § 18:562 (*Louisiana*); MISS. CODE ANN. § 23-15-563 (*Mississippi*); MO. REV. STAT. § 115.427 (*Missouri*); MONT. CODE ANN. § 13-13-114 (*Montana*); R.I. GEN. LAWS § 17-19-24.2 (*Rhode Island*); S.C. CODE ANN. § 7-13-710 (*South Carolina*); S.D. CODIFIED LAWS § 12-18-6.1 (*South Dakota*); TENN. CODE ANN. § 2-7-112(c) (*Tennessee*); TEX. ELEC. CODE ANN. § 63.001(b) & (i) (*Texas*); WIS. STAT. § 6.87(6) (*Wisconsin*).

hard to conceive how the photo-ID requirements of HB 458 actually *prevents* someone from voting, or even impedes them from voting.

Plaintiffs offer expert testimony on the burdens of obtaining a photo-ID faced by someone who does not already have one, such as presenting the required documents at the BMV and paying fees if someone opts to obtain a form of photo-ID other than the free one offered by the State.  (*See* ECF #46-20, *Expert Report of Kenneth Mayer, Ph.D.*, PageID #715-716).  But these are precisely the same "burdens" the Supreme Court held as minimal and not causing unconstitutional impediments to voting in *Crawford*.  This is especially so where, as in *Crawford*, a free State ID card is available to a State's voters, and even more especially so in Ohio where one can vote absentee by mail without any photo-ID at all.  *See Crawford*, 553 U.S. at 185-86 (Stevens, J.); *see also Mays*, 951 F.3d at 786 (burden analysis considers alternative means of voting).  State photo-ID voting requirements are routinely held constitutional.  *See, e.g.*, *Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016) (upholding Virginia photo-ID requirement); *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) (upholding Wisconsin photo-ID requirement); *Common Cause/Ga. v. Billups*, 554 F.3d 1340 (11th Cir. 2009) (upholding Georgia photo-ID requirement).

As already noted, under HB 458, Ohio provides voters presently without a photo-ID the availability of obtaining a state ID for free to Ohioans age 17 or older.  OHIO REV. CODE § 4507.50 (effective April 7, 2023).  Evidence shows that the wait time at local BMV offices, where such photo-IDs are issued, and which are located in every county throughout the State (in most cases at many locations), average wait times are under 10 minutes.  (ECF #46-16, *Dep. of Sydney King* [Ohio BMV], PageID #628).  On the day a person appears, they are given an interim ID, which is an acceptable for of ID to vote under HB 458.  (ECF #46-16, PageID #635,

#649).  And, the evidence showed that even if a voter might lack some of the documents needed to obtain an Ohio ID card or Ohio Driver's License, the BMV can make exceptions to the document requirements.  (ECF #46-16, PageID #646-646).  Thus, obtaining a photo-ID in Ohio presents at most a minimal burden to voters who choose to vote in person, and is not an unconstitutional burden on the right to vote.  *Crawford*, 553 U.S. at 197-200 (lead opinion of Stevens, J.); *id.* at 204, 209 (Scalia, J., concurring in the judgment).

### b. *Advancing of Early Mail-Ballot Deadlines*

Plaintiffs also contend that the changes brought about by HB 458 to mail-ballot deadlines create an unconstitutional "undue burden" for Ohio voters.  (ECF #13, *Amended Complaint*, ¶ 142).  This analysis begins with the earlier Sixth Circuit pronouncement that "there is no constitutional right to an absentee ballot," and States have no obligation to permit voters to vote absentee or by mail.  *Mays*, 951 F.3d at 792.

HB 458 advances the deadline for requesting an absentee mail-in ballot and for when such absentee mail-in ballots must be received by the board of elections.  As to the request date, Ohio voters generally can begin requesting ballots as early as "the first day of January of the year of the elections for which the absent voter's ballots are requested or not earlier than ninety days before the day of the election at which the ballots are to be voted, whichever is earlier."  OHIO REV. CODE § 3509.03(D)(effective April 7, 2023); *see also Mays*, 951 F.3d at 792 ("Ohio law provides electors over ten months to request an absentee ballot").  HB 458 changed the end date of that up-to-ten-month period in the case of general elections from three days before Election Day to seven days before Election Day.  OHIO REV. CODE § 3509.03(D) (effective April 7, 2023).  This new deadline places Ohio among the plurality of States (around 23 in all) that require voters to make a request for an absentee ballot, by mail, a week or more before an

-28-

election. (*See* ECF #46-9, *Table 5: Applying for an Absentee Ballot*, Nat'l Conf. of State Legislatures, PageID #488-501).

HB 458 made no change to the date by which an absentee ballot must be returned. It must be postmarked no later than the day before Election Day. *Compare* OHIO REV. CODE § 3509.05(D)(2)(a) (effective April 7, 2023) *with* OHIO REV. CODE § 3509.05(B)(2)(a) (2022).[28] HB 458 did, however, change the deadline by which a board of elections must receive the absentee ballot from ten days after Election Day to four days after Election Day. OHIO REV. CODE § 3509.05(D)(2)(a) (effective April 7, 2023). With this change, Ohio is still more generous than 30 other States, which do not accept *any* absentee ballots received after Election Day. (*See* ECF #46-8, *Table 11, Receipt and Postmark Deadlines for Absentee/Mail Ballots*, Nat'l Conf. of State Legislatures, PageID #477-486).[29]

---

[28]

For "UOCAVA" voters [Uniformed and Overseas Citizens Absentee Voting Act], their ballots can be signed at any time before the close of polls on Election Day, regardless of postmark date. OHIO REV. CODE § 3511.09(A). (*See* ECF #46-2, Directive 2023-03, PageID #416).

[29]

These States impose a variety of deadlines related to the time on Election Day by which such absentee ballots must be received, but all of these deadlines are *on* Election Day. *See* ALA. CODE § 17-11-18 (*Alabama*) (noon on Election Day); ARIZ. REV. STAT. § 16-548 (*Arizona*) (7:00 pm on Election Day); ARK. CODE ANN. § 7-5-411 (*Arkansas*) (7:30 pm on Election Day); COLO. REV. STAT. § 1-7.5-107 (*Colorado*) (7:00 pm on Election Day); CONN. GEN. STAT. § 45-9-140b (*Connecticut*) (close of polls on Election Day); DEL. CODE ANN. tit. 15, § 5508 (*Delaware*) (close of polls on Election Day); FLA. STAT. § 101.67 (*Florida*) (7:00 pm on Election Day); GA. CODE ANN. § 21-2-386 (*Georgia*) (close of polls on Election Day); HAW. REV. STAT. § 11-104 (*Hawaii*) (close of polls on Election Day); IDAHO CODE § 34-1005 (*Idaho*) (8:00 pm on Election Day); IND. CODE §§ 3-11.5-4-3 & 3-11.5-4-10 (*Indiana*) (noon on Election Day); IOWA CODE § 53.17(2) (*Iowa*) (close of polls on Election Day); KY. REV. STAT. ANN. § 117.086 (*Kentucky*) (close of polls on Election Day); ME. REV. STAT. ANN. tit. 21-A, § 755 (*Maine*) (close of polls on Election Day); MICH. COMP. LAWS § 168.764A (*Michigan*) (close of polls on Election Day); MINN. STAT. § 203B.08 (*Minnesota*) (close of polls on Election Day); MO. REV. STAT. § 115.293 (*Missouri*) (close of polls on Election Day); MONT. CODE ANN. § 13-13-232 (*Montana*) (close of polls on Election Day); NEB. REV. STAT. § 32-950 (*Nebraska*)

-29-

Given that Ohio's still remarkably generous voting laws allow for a four-day period after Election Day for late-received mail-in absentee ballots, *a buffer period which more than 30 other States do not offer at all*, it is all but inconceivable how Ohio's change in the number of days after Election Day now allowed for receipt under HB 458 constitutes a "burden" on voters, especially since the date for returning one's ballot remains the same.

### c.  *Elimination of Monday-Before-Election-Day Early Voting*

Plaintiffs challenge HB 458's elimination of Monday-Before-Election-Day early in-person voting and redistributing those hours of early in-person voting to other days of the early voting period.  (ECF #13, *Amended Complaint*, ¶ 144).  HB 458 moves the six hours of early in-person voting formerly available on that day to the Monday through Friday of the week before Election Day (and, in practice, because those days are already days the board of elections provides for all-day in-person voting, the added hours are evening hours, allowing for after-work voting).[30]  The Court first notes that early voting is not required by the Constitution at all, but

---

(close of polls on Election Day); N.H. REV. STAT. § 657:22 (*New Hampshire*) (5:00 pm on Election Day); N.M. STAT. ANN. § 1-6-10(B) (*New Mexico*) (7:00 pm on Election Day); OKLA. STAT. ANN. tit. 26, § 14-104 (*Oklahoma*) (7:00 pm on Election Day); 25 PA. CONS. STAT. § 3146.8 (*Pennsylvania*) (8:00 pm on Election Day); R.I. GEN. LAWS § 17-20-8 (*Rhode Island*) (8:00 pm on Election Day); S.C. CODE ANN. § 7-15-420 (*South Carolina*) (close of polls on Election Day); S.D. CODIFIED LAWS § 12-19-12 (*South Dakota*) (close of polls on Election Day); TENN. CODE ANN. § 2-6-304 (*Tennessee*) (close of polls on Election Day); VT. STAT. ANN. tit. 17, § 2543 (*Vermont*) (close of polls on Election Day); WIS. STAT. § 6.87(6) (*Wisconsin*) (8:00 pm on Election Day); WYO. STAT. ANN. § 22-9-119 (*Wyoming*) (close of polls on Election Day).

[30]

"In-person absentee voting must be permitted for all voters starting the day after the close of voter registration before an election and ending on the Sunday before the election.  The Monday immediately before Election Day is eliminated as an in-person absentee voting day.  To make up for that loss of six hours of voting time, the Secretary of State is required to reallocate those hours by adding six hours on Monday through Friday of the preceding week."  (ECF #46-2, Directive 2023-03, PageID #418).

Ohio has provided for it anyway to all Ohio citizens since 2005. *Obama for America v. Husted*, 697 F.3d 423, 426 (6ᵗʰ Cir. 2012); Ohio Rev. Code §§ 3509.02-3509.04. Not all States allow no-excuse early voting. Alabama, Mississippi, and New Hampshire do not allow early voting at all. (ECF #46-10, *Early In-Person Voting*, Nat'l Conf. of State Legislatures, PageID #503-523). Other States stop early voting on the Sunday before the election (such as Delaware),[31] four days before the election (such as Massachusetts),[32] or even a week before the election (such as Louisiana).[33]

The Sixth Circuit, opining on another change to Ohio's early-voting schedule – eliminating what was known as "Golden Week" – characterized the elimination of the early voting days at issue as merely "a withdrawal or contraction of" the "conveniences" that Ohio afforded to voters, and could "hardly be deemed to impose a true 'burden'" at all.[34] *Ohio*

---

[31]    Del Code Ann. tit. 15, § 5402.

[32]    Mass. Gen. Laws ch. 54, § 25(B)(2).

[33]    La. Stat. § 18:1309(A)(1)(a)(i).

[34]    "Golden Week" refers to a feature of the Ohio voting laws existing between 2004 and 2012, whereby those wishing to vote absentee (which in 2004 required an "excuse" as to why one could not vote in person on Election Day, a restriction that was omitted in 2005) could pick up their ballot at the board of elections 35 days before an election, which overlapped with Ohio's voter registration period by five days (which ended 30 days before an election), thus creating a "Golden Week" in which a person could both register to vote and vote absentee during that five-day period. *See Ohio Democratic Party*, 834 F.3d at 624. After "no excuse" absentee voting was instituted in 2005 (which continues to this day), this "Golden Week" was available to all Ohio citizens (and specifically then-unregistered voters) until 2012, when the absentee voting period was shortened to 29 days, thus eliminating the "Golden Week." *Id.* The court in *Ohio Democratic Party* upheld the change to Ohio's voting laws, which eliminated six days of early voting availability, as constitutional (as well as not a violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301).

-31-

*Democratic Party v. Husted*, 834 F.3d 620, 628 (6th Cir. 2016).

Plaintiffs produced no evidence of anyone being prevented from voting, or even impeded in voting, by the revised early-voting period without Monday-Before-Election-Day in-person voting in either of the May 2023 or August 2023 elections.  (*See* ECF #46-13, *Dep. of Melissa Cropper* [Ohio Federation of Teachers], PageID #583-585 (not aware of anyone impeded from voting in May 2023 election for any reason); ECF #46-14, *Dep. of Willis Gordon* [NAACP Chairman for Armed Services & Veterans Affairs], PageID #598 (not aware of anyone not voting because they could not go on Monday-Before-Election-Day), PageID #599 (not aware of anyone who will not vote in the future because of elimination of Monday-Before-Election-Day voting); ECF #46-17, *Dep. of  Anthony Perlotti* [Director, Cuyahoga County Board of Elections], PageID #670 (not aware of anyone impeded from voting in May 2023 election); ECF #46-19, *Dep. of Norman Wernet* [Ohio Alliance for Retired Americans], PageID #699 (not aware of anyone impeded from voting in May 2023 election, including related to Monday-Before-Election-Day voting); ECF #46-18, *Dep. of Eric Sagester* [Ohio Republican Party], PageID #690 (not aware of any Ohio Republican Party members who tried to vote on Monday-Before-Election-Day).  Nor did Plaintiffs present evidence that the revised early-voting period reduced turnout in either of those elections.  (ECF #46-21, *Dep. of Kenneth Mayer* [Plaintiffs' Expert], PageID #751 (did not analyze any elections conducted under HB 458); ECF #46-24, *Dep. of  Rocío Titiunik, Ph.D.* [Plaintiffs' Expert], PageID #890-892 (not aware of whether HB 458 affected or reduced turnout at elections).

Plaintiffs' experts provided no studies about the likely effects of redistributing early-voting time.  (ECF #46-25, *Expert Report of Karen L. Owen, Ph.D.* [Defendant's Expert], PageID #997 (Plaintiffs' Expert Report, by Kenneth Meyers, Ph.D., does not account for changes

in early-voting schedule).  Nor did Plaintiffs' experts offer evidence of the effects of HB 458 in either of the May 2023 or August 2023 elections, whether voters would vote on other days or through other methods, or examine how easy or difficult it would be for voters to adapt to the redistribution of early-voting hours.

Plaintiffs offered no meaningful evidence that the elimination of Monday-Before-Election-Day from the early in-person voting hours and redistributing those hours to the week before presented any burden to voters.  Plaintiffs' argument seems to be that *any* change from the prior early-voting schedule, even a neutral one with respect to the total number of hours offered over the four-week early voting period, is a "burden."

The following passage – reproduced from portions of the opening and the conclusion of the Sixth Circuit decision in *Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) – while specifically related to Ohio's elimination of six days of early-voting availability during "Golden Week," is equally applicable here to the elimination of Monday-Before-Election-Day early voting (especially so, given that HB 458 merely *moves* those early voting hours to the week before Election Day):

> Ohio is a national leader when it comes to early voting opportunities. . . .  [It] is really quite generous.  The law is facially neutral; it offers early voting to everyone.  The Constitution does not require *any* opportunities for early voting and as many as thirteen states offer just one day for voting: Election Day. . . . [Plaintiffs] insist that Ohio's prior accommodation . . . established a federal floor that Ohio may add to but never subtract from.  This is an astonishing proposition.
>
> Nearly a third of the states offer no early voting.  Adopting plaintiffs' theory of disenfranchisement would create a "one-way ratchet" that would discourage states from ever increasing early voting opportunities, lest they be prohibited by federal courts from later modifying their election procedures in response to changing circumstances. . . .  [W]hile the challenged regulation may slightly diminish the convenience of registration and voting, it applies even-handedly to all voters, and, despite the change, Ohio continues to provide generous, reasonable, and accessible voting options to all Ohioans.  The issue is not whether some voter somewhere

-33-

would benefit from six additional days of early voting or from the opportunity to register and vote at the same time.  Rather, the issue is whether the challenged law results in a cognizable injury under the Constitution or the Voting Rights Act.  We conclude that it [there, the elimination of "Golden Week"] does not.

\* \* \* \* \*

Plaintiffs [ask] that we adopt a broad rule that any expansion of voting rights must remain on the books forever.  Such a rule would have a chilling effect on the democratic process: states would have little incentive to pass bills expanding voting access if, once in place, they could never be modified in a way that might arguably burden some segment of the voting population's right to vote.  Accepting the "long recognized . . . role of the States as laboratories for devising solutions to difficult legal problems," we hold that imposing such a one-way ratchet is incompatible with the "flexible" *Anderson-Burdick* framework.

*Id.* at 623, 635 (inserts supplied, citation omitted).

Plaintiffs have not offered credible evidence showing that the removal of Monday-Before-Election-Day in-person early voting with adoption of HB 458 created a burden for voters.

### d.  *Ballot "Drop-Box" Provisions*

Plaintiffs challenge HB 458's provision limiting ballot-return drop-boxes to a single drop- box located at the board of elections offices.  (ECF #13, *Amended Complaint*, at ¶ 143). The evidence shows that HB 458 for the first time officially *adds* that alternative way for voters to securely return their absentee ballots – at any time of the day or night.  Prior to HB 458, the Ohio election laws did not provide for drop-boxes at all.  The concept of drop-boxes was created by Ohio Secretary of State Directive 2020-16 – a directive that provided for a single drop-box per county located at the board of elections.  The Sixth Circuit has already found that both of these limitations are constitutional.  *See A. Philip Randolph Inst. v. LaRose*, 831 F. App'x 188, 190-92 (6th Cir. 2020) (finding that "limiting drop boxes to one location per county promotes the accuracy of the election" and that Ohio's restrictions contained in that Directive "easily pass constitutional muster").

-34-

HB 458 provides that each county may maintain one drop-box for collection of absentee ballots. OHIO REV. CODE § 3509.05(C)(2)-(3). Ballot drop-boxes must now be available "24/7" during the absentee voting period, and they must be continually monitored by video. (ECF #46-2, Directive 2023-03, PageID #417). Making it *easier* to vote absentee can hardly constitute a "burden" on voters.

Plaintiffs have not put forward any evidence of an individual who has been prohibited from voting under HB 458's drop-box rules, or even inhibited by it. (*See* ECF #46-13, *Dep. of Melissa Cropper* [Ohio Federation of Teachers], PageID #583-585 (not aware of any Ohio member whose vote was impeded in May 2023 election); ECF #46-14, *Dep. of Willis Gordon* [NAACP Chairman for Armed Services & Veterans Affairs], PageID #595 (not aware of any veteran voting by drop box in May 2023 election); ECF #47-17, *Dep. of Anthony Perlotti* [Director, Cuyahoga County Board of Elections], PageID #670 (not aware of any Cuyahoga County voter whose ability to vote in the May 2023 election was impeded); ECF #46-19, *Dep. of Norman Wernet* [Ohio Alliance for Retired Americans], PageID #61 (not aware of any member who voted by drop-box in May 2023 election)).[35] Nor did any of Plaintiffs' experts provide any analysis of how HB 458's drop-box rules operated, or affected, any voters, in either of the May 2023 or August 2023 elections.

Put simply, Plaintiffs did not provide evidence that the drop-box rules of HB 458 imposed *any* burden on Ohio voters, much less an "undue" one.

---

[35] Nor did Plaintiffs offer any evidence on impediments related to the drop-box provisions of HB 458 in connection with the August 2023 election.

**e.** *Reduction of "Cure Period"*

Lastly, Plaintiffs challenge HB 458's shortening of the period for "curing" a defect in an absentee ballot, or for "curing" a provisional ballot cast in person by showing proper identification at the board of elections, from seven days to four days.  OHIO REV. CODE § 3505.181(B)(7)-(8) (effective April 7, 2023).  The effect of this change is to standardize the time period for all of the "post Election Day" deadlines to four days (provisional voting cure, signing a religious objection to producing photo-ID, correcting or providing information needed on an absentee mail ballot, or receiving and absentee ballot).  (ECF #46-2, Directive 2023-03, PageID #415-416).  As to the "cure period," the Court begins its analysis by first noting that the evidence tended to demonstrate that no one actually *uses* the cure period.  (*See* ECF #46-17, *Dep. of Anthony Perlotti* [Director, Cuyahoga County Board of Elections], PageID #662-664 (""[A]s director and deputy director, I'm not aware of an individual coming to cure a provisional ballot post election"); ECF #47-9, *Dep. of Jeffrey Matthews* [Director, Stark County Board of Elections], PageID #2177 ("[T]here's not a lot of participation in the cure period").  As already noted in the above portion of this *Memorandum of Opinion and Order*, in connection with the four-day post-Election-Day period for receiving late mail-in ballots, there is no constitutional right to a post-Election-Day relief period *at all*.  And, even against the background of Ohio's generous voting law regime, the Sixth Circuit has also previously held that a three-day reduction in the cure period "impose[d] a trivial burden on Ohio voters."  *NEOCH*, 837 F.3d 612, 635 (6th Cir. 2016).

As to correction of mail-in ballots, there is no reason to contend that the changes to the "cure period" are burdensome.  Ohio law permits absentee ballots to be sent to overseas and military voters 46 days before Election Day and to domestic voters 29 days before Election Day.

-36-

OHIO REV. CODE § 3509.01(B)(1) (effective April 7, 2023). Combined with the over ten-month period in some cases by which Ohio voters can request an absentee ballot, Ohio voters have more than enough time to request, receive, complete, and return their absentee ballots before the expiration of the now four-day cure period. Voters who choose to use Ohio's generous absentee voting regime to vote absentee can hardly claim a "constitutional right" to wait until the last minute to return their absentee ballots, and then risk the possibility that by doing so also risking the possibility of receiving untimely notice of a defect that could otherwise be cured (and with the now seven-days-before-Election-Day deadline to request such a ballot, even less so).

The shortening of the prior "cure period" from seven days to four days brought about by HB 458 is not an unconstitutional "burden" on Ohio voters.

### f. *"Cumulative Effect" of Voting Law Changes*

In addition to asserting that each of the five challenged provisions produce an "undue burden" on Ohioans' voting rights, Plaintiffs also contend that these changes cumulatively burden such rights. (ECF #13, *Amended Complaint*, ¶ 138). As noted in the previous discussion of the five individual provisions challenged by Plaintiffs, the changes to Ohio election law brought about by HB 458 are each very small changes to Ohio's voting laws – laws that apply equally to all Ohioans. Ohio's generous voting law regime appears to rise well above the constitutional floor for voting.

While the changes made by HB 458 may have minimally changed the contours of Ohio's voting laws, these changes are entirely distinct from the content and contours of the "right to vote" that is protected by the Constitution. Both before and after HB 458, Ohio's voting laws offer a variety of accessible and convenient ways to vote, available to all registered voters equally. One can vote in-person on Election Day, or early in-person over a period of many weeks

– a period which includes five days with evening hours and two weekend days – using a variety of acceptable forms of photo-ID.  One can vote absentee early, with no excuse needed to obtain an absentee ballot and no photo-ID required to submit such a ballot, which one can return either by mail or in-person using a drop-box at the board of elections.  Absentee mail-in ballots are accepted for four days after Election Day, so long as they are postmarked by the day before Election Day (and for "UOCAVA" voters [Uniformed and Overseas Citizens Absentee Voting Act], their ballots can be signed at any time before the close of polls on Election Day, regardless of postmark date, so long as they are received within those four days);[36] and voters who either voted provisionally in-person because they did not have the required photo-ID, or voters whose mail-in ballots needed more information or correction, have those same four days after Election Day to "cure" any issue arising in connection with their ballot.

Both before and after the passage of HB 458, voting remains "[v]ery easy" in Ohio.  *Ohio Democratic Party*, 834 F.3d at 628 ("The . . . record shows that it's easy to vote in Ohio.  Very easy, actually.").  The burdens, if any, placed on Ohio voters as a result of the changes brought about by HB 458 are minimal, whether viewed individually or cumulatively.  Thus, the Court finds that  the deferential, rational basis review under the *Anderson-Burdick* framework is appropriate.  *See Mays v. LaRose*, 951 F.3d 775, 784 (6th Cir. 2020) ("Under *Anderson-Burdick*, we first look to the burden the State's regulation imposes on the right to vote.  When States impose reasonable non-discriminatory restrictions on the right to vote, courts apply rational basis review and the State's important regulatory interests are generally sufficient to justify the restrictions.") (citing, *Burdick*, in turn citing *Anderson*) (citations and internal quotation omitted).

---

[36]

      OHIO REV. CODE § 3511.09(A).  (*See* ECF #46-2, Directive 2023-03, PageID #416).

### 3.  *Rational Basis Review*

When an election law is minimally burdensome, it receives deferential rational-basis review.  *Mays*, 951 F.3d at 784.  Under this standard, essentially any "important regulatory interests" support the imposition of minimal voting burdens (and obviously so when the election law imposes no meaningful voting burdens).  *Id.*  Here, the changes brought about by HB 458 make rather minor changes to Ohio's voting laws, none of which meaningfully impacts anyone's ability to vote under Ohio's generous voting laws.  It remains "[v]ery easy" to vote in Ohio.  *Ohio Democratic Party*, 834 F.3d at 628.

The Ohio Secretary of State (and, thus, the State of Ohio) has provided ample evidence that the changes to Ohio's voting laws were enacted to help ensure and promote the smooth, prompt administration of elections, election security, and public confidence in elections.  The State is permitted to offer this evidence at any time.  *See Mays*, 951 F.3d at 789 (rejecting plaintiffs' argument that *post hoc* rationalizations cannot satisfy the scrutiny applied to election laws and noting that "[n]o opinion from this court or the Supreme Court has ever limited the record that the State can build in order to justify a burden placed on the right to vote" and that "the language used by this court in *Obama for America* [*v. Husted*, 697 F.3d 423 (6th Cir. 2012)] suggests that the State may come up with its justifications at any time") (citation insert supplied).

Here, the State of Ohio asserts that HB 458 supports its interests in "preventing voter identification fraud, deterring and detecting voter fraud, safeguarding voter confidence in elections, improving and modernizing election procedures, ensuring orderly election administration, and providing expeditious election results."  (*See* ECF #46-6, *Defendant Ohio Secretary of State's Resp. to Plaintiffs' First Set of Interrogs.*, PageID #461).  This is consistent

-39-

with the reasons set forth in the Ohio legislature at the time of consideration of HB 458.[37]

"[P]reserving the integrity" of elections is "indisputably . . . a compelling interest." *Eu v. San Francisco Cty. Dem. Cent. Comm.*, 489 U.S. 214, 231 (1989).  Maintaining "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  Consistent with the importance of these interests, the Supreme Court and other courts have approved of photo-ID laws under the *Anderson-Burdick* framework.  *Crawford*, 553 U.S. at 204 (opinion of Stevens, J.); *id.* at 209 (concurring opinion of Scalia, J.); *see also Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016); *Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014); *Common Cause/Georgia v. Billups*, 554

---

[37]
These interests were identified in the *Memorandum in Support of Intervenor-Defendants' Motion for Summary Judgment*, (ECF #46-1), and Exhibits submitted in support of the motion, as:  (1) Floor Statement of Rep. Bill Seitz (Dec. 14, 2022), https://www.ohiochannel.org/video/ohio-house-of-representatives-12-14-2022-part-3 at 6:04-6:26, 7:00-10:12, 29:30-29:43 (discussing importance of shoring up public confidence in counting absentee ballots; explaining that boards of elections have advocated for elimination of Monday-Before-Election-Day early voting for over a decade in light of the administrative problems it creates; explaining that cure and ballot receipt deadlines changes were geared toward allowing speedier determination of election results; identifying the importance of photo-ID as a "secure form of identification"); (2) Floor Statement of Senator Theresa Gavarone (Dec. 13, 2022), https://ohiosenate.gov/session/video/ohio-senate-12-13-2022-186122, at 1:32:14-1:32:51, 1:33:19-1:33:26 ("And I also want to improve the perception, confidence, and integrity of our elections by simply requiring voters to provide that they are who they say they are . . . .  We have a trust deficit in our elections right now . . . .  But it's imperative that we give people doubting the results of our elections reason to participate in them"); Floor Statement of Senator Niraj Antani (Dec. 13, 2022), https://ohiosenate.gov/session/video/ohio-senate-12-13-2022-186122, at 1:47:19-1:47:40 ("[W]ithout election integrity, nothing else we do matters.  If the voters do not believe, or if they know, that our elections are not . . . secure, the confidence in what we do is undermined."); Testimony of Beau Euton before Ohio Senate Local Gov't & Elections Comm. (Dec. 7, 2022) (ECF #46-27) ("Ohio citizens want to know that when they vote, they're doing so in free, fair, and valid elections.  These commonsense reforms will increase election security and voter confidence."); *cf.* Statement of Senator Theresa Gavarone (May 24, 2022) (ECF #46-28) (identifying the purposes of predecessor legislation, SB 320, as "reducing the possibility of election fraud in Ohio" and "better ensur[ing] confidence in our elections").

F.3d 1340 (11th Cir. 2009).

Here, the evidence offered by both Plaintiffs and Defendants acknowledged that substantial proportions of the public lack confidence in election integrity. (*See* ECF #46-25, *Expert Report of Karen L. Owen, Ph.D.* [Defendant's Expert], at PageID #975-980; ECF #46-21, *Dep. of Kenneth Mayer, Ph.D.* [Plaintiffs' Expert], at 797-798 (although opining that such lack of confidence is often the result of elected officials and public leaders misrepresenting the security of elections)). It follows that a State's interest in enacting legislation to increase such confidence is an "important State interest."

The State of Ohio also offered evidence on its interest in deterring, preventing, and identifying voter fraud. While detected substantial voter fraud may be exceedingly rare in Ohio – such as when a non-citizen casts a ballot despite being ineligible to vote – the State offered evidence that each year Ohio refers 10 or more instances of such fraud for prosecution. (*See* ECF #46-15, *Dep. of Jeffrey Hobday* [Attorney for the Ohio Legislative Service Commission], PageID #617). The State of Ohio offers that HB 458, by requiring Ohio Driver's Licenses or Ohio ID cards to vote in-person (or to "cure" provisional ballots), each of which now includes "a notation designating that the licensee is a noncitizen,"[38] advances that interest. The evidence produced also shows that the vast majority of Ohioans used either an Ohio Driver's License or an Ohio ID card to vote even before passage of HB 458; and now, voters can use a U.S. Passport or Passport Card as well. (*See* ECF #46-22, *Expert Report of Rocío Titiunik, Ph.D.* [Plaintiffs' Expert], PageID #816; ECF #46-23, *Supplemental Expert Report of Rocío Titiunik, Ph.D.*, Page ID #877-

---

[38] OHIO REV. CODE §§ 4507.52(A)(2) (effective April 7, 2023) & 4506.11(A)(13) (effective April 7, 2023).

-41-

878 (estimating that fewer than a million Ohioans hold a military ID); ECF #46-29, *Certificates of Non Citizen Nationality*, U.S. Dep't of State, PageID #1106-1110; ECF #46-30, *USA.gov, Apply for a New Adult Passport*, PageID #1112-1114 (U.S. passports are held almost exclusively by U.S. citizens)). While Plaintiffs offer considerable evidence that detected voter fraud is exceedingly rare and that after the 2022 General Election (prior to passage of HB 458) Ohio Secretary of State (and Defendant here) Frank LaRose stated that Ohio's elections represent the "gold standard" in election integrity, (*see* ECF #62, and Exhibits cited therein, at PageID #3731-3734), Supreme Court precedent also instructs that States are not required to wait for voter fraud – and the ensuing damage to public confidence in the electoral process – to occur before taking efforts to protect their elections. States are permitted to regulate prophylactically to prevent voter fraud before it occurs, or public confidence in elections is damaged by it. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2347-48 (2021); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).

As to drop-box rules, the Sixth Circuit has previously noted that such rules promote the important State interests of "uniformity*, which in turn promotes the fair administration of elections," "efficiency . . . in administering elections," and "the accuracy of the election." *A Philip Randolph Inst. of Ohio v. LaRose*, 831 F. App'x 188, 192 (6th Cir. 2020). Following this reasoning, the Sixth Circuit found that an almost-identical version of the drop-box rules as are present in HB 458 "easily pass[ed] constitutional muster." *Id.*[39]

---

[39]

The *A. Philip Randolph of Ohio* case involved the Ohio Secretary of State's Directive 2020-16 to prohibit county boards of election from "installing a drop box at any other location other than the board of elections." 831 F. App'x at 191. Plaintiffs filed a complaint, and moved for a preliminary injunction asking the district court to enjoin Directive 2020-16 "to the extent that it would limit county boards of elections to a single ballot drop off box at the board office."

The remaining provisions, representing minor changes to the timing of applying for applying for a mail-in ballot, receiving a mail-in ballot at the board of elections after Election Day, the "cure" period available after Election Day, and the redistribution of early-voting hours from the Monday-Before-Election-Day to the week before Election Day, are each reasonably directed toward the State of Ohio's goal of smooth, prompt election administration and promoting public confidence in elections. *See Crawford*, 553 U.S. at 196-97 (opinion of Stevens, J.) ("[T]he interest in orderly administration and accurate recordkeeping" provides a sufficient justification for election laws furthering these interests); *id*. at 209 (concurring opinion of Scalia, J.) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence – not a constitutional imperative") (parenthetical in original); *Timmons*, 520 U.S. at 364-65 ("States certainly have an interest in protecting the fairness, integrity, and efficiency of their ballots and election processes"); *Common Cause Ind. v. Lawson*, 977 F.3d 663, 665 (7th Cir. 2020) ("Counting the votes, and announcing the results, as soon as possible after the polls close serves a civic interest"); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("Because the State's Election Day deadline imposes only a reasonable burden even on absentee voters who receive their ballots later than usual, the State's interests easily survive the *Anderson-Burdick* framework"); *Ariz. Dem. Party v. Hobbs*, 976 F.3d 1081, 1085 (9th Cir. 2020) ("Under the familiar *Anderson-Burdick* framework for evaluating ballot access laws, a nondiscriminatory, minimally burdensome voting requirement will be

_____

*Id.* at 190. The district court enjoined the Secretary of State from "enforcing that portion of Directive 2020-16 that prohibits a county board of elections from installing a secure drop box at a location other than the board of elections office" and from "prohibiting a board from deploying its staff for off-site ballot delivery." *Id.* The Sixth Circuit later stayed the injunction. *Id.* at 191-93.

-43-

upheld so long as it reasonably advances important regulatory interests"); *Mays*, 951 F.3d at 787 (recognizing that the limited resources possessed by boards of election, and the many tasks boards must complete in the days before an election and on Election Day, justified the voting deadline at issue). As noted earlier, the evidence shows that local election officials in Ohio have pressed for an early voting calendar that ends prior to the Monday-Before-Election-Day for over a decade to allow them to better manage their responsibilities in the immediate run-up to elections. Statement of Rep. Bill Seitz at 6:04-6:26, 7:00-10:12; *see also* ECF #46-5, *LaRose Implementing New Election Reforms, Ohio Secretary of State*, PageID #455 ("At the request of bipartisan election officials and with the approval of the Ohio General Assembly, HB 458 removes Monday before election day from the early voting calendar so boards may better prepare for election day"). Completing the task of sending out absentee ballots earlier, by shortening the over ten month period in which one can request an absentee ballot by four days, allows local election officials to transition earlier to other time-sensitive tasks. Completing the cure period and the receipt of absentee ballots earlier serves the same purpose, including allowing boards of elections to finalize and certify the results earlier, which in turn will further the interest of promoting public confidence in the process.

Applying rational-basis review, or even a more "medium-level" review contemplated by *Anderson-Burdick*, HB 458 easily "pass[es] constitutional muster." *A. Philip Randolph Inst.*, 831 F. App'x at 191-92.

### 4. *Heightened Review*

Plaintiffs' *Amended Complaint*, however, characterizes the burdens placed on Ohio voters by the changes brought about by HB 458 as "severe." (ECF #13, *Amended Complaint*, ¶ 138) ("Both independently and cumulatively, the Challenged Provisions inflict severe burdens on Ohio

voters"). The Sixth Circuit, applying *Anderson-Burdick* analysis, in *Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020), reserves strict scrutiny review for cases presenting truly "severe restrictions on the right to vote, such as poll taxes or limiting *access* to the ballot." *Id.* at 784 (emphasis supplied). The challenged provisions of HB 458 are hardly in the same realm as "poll taxes" or other restrictions that would "totally deny" an Ohio voter "a chance to vote." *See Mays*, 951 F.3d at 784, 787 ("Because Plaintiffs are not totally denied a chance to vote by Ohio's absentee ballot deadlines, strict scrutiny is inappropriate"). Strict scrutiny review does not apply to this case. Yet, even if the Court were to apply strict scrutiny analysis in this case, the provisions of HB 458 would survive.

Applying a "heightened review" accorded to "in between" cases by the Sixth Circuit under *Anderson-Burdick* – which requires a district court to "determine both the extent to which the law burdens the right to vote as well as [a State's] interests in the regulation, and then weigh the two against one another," *see Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 562 (6th Cir. 2021) (Readler, J. concurring) ("[U]nder our Circuit's precedents, if the burden falls somewhere in between, we weigh that burden against "'the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights'") – also leads the Court to a finding that the minimal burdens imposed on Ohio voters by HB 458 are easily outweighed by Ohio's interests identified as motivation for passing HB 458.

The record here demonstrates that the small changes to Ohio's election laws made by HB 458 – whether viewed individually or cumulatively, and whether weighed under "rational basis" review or the "heightened" review applied in the Sixth Circuit when rendering decisions under *Anderson-Burdick* – lead to a clear finding that the changes to the provisions of Ohio's voting

laws brought about by HB 458 do not render those laws unconstitutional.

## IV.  CONCLUSION

Accordingly, for each of the reasons stated above, the *Ohio Secretary of State's Motion for Summary Judgment* (ECF #48) is GRANTED; and, the *Intervenor-Defendants' Motion for Summary Judgment* (ECF #46) is GRANTED.

The *Motion of the Foundation for Government Accountability for Leave to Participate as Amicus Curiae and File Brief* (ECF #49) is GRANTED; and, the *Motion of Honest Elections Project for Leave to File Amicus Brief in Support of Defendant's Motion for Summary Judgment* (ECF #57) is GRANTED.

The *Intervenor-Defendants' and the Secretary's Motion to Strike Plaintiffs' Improper, Untimely, and Late-Filed Evidence* (ECF #68) is DENIED as moot.

IT IS SO ORDERED.


*/s/ Donald C. Nugent*
DONALD C. NUGENT
United States District Judge


DATED:   January 8, 2024